**In re MERRILL LYNCH, et al. SECURITIES LITIGATION.**

**Civ. No. 94–5343 (DRD).**

United States District Court, D. New Jersey.

Dec. 15, 1995.

Karen Morris, Morris & Morris, Wilmington, DE, Paul Dillon, Greenberg, Dauber & Epstein, Newark, NJ, for Plaintiffs.

Bruce Coolidge, Wilmer, Cutler & Pickering, Washington, DC, Joseph A. Boyle, Kelley, Drye & Warren, Parsippany, NJ, for Defendant Painewebber, Inc.

Jonathan Eisenberg, Kirkpatrick & Lockhart, Washington, DC, New York City, Brian F. Amery, Bressler, Amery & Ross, Florham Park, NJ, for Defendant Merrill Lynch, Pierce, Fenner & Smith, Inc.

Frank A. Holozabiec, Kirkland & Ellis, New York City, Jonathan L. Goldstein, Hellring, Lindeman, Goldstein & Siegal, Newark, NJ, for Defendant Dean Witter Reynolds Inc.

## OPINION

DEBEVOISE, Senior District Judge.

This is a class action in which the complaint charges defendant brokerage firms with securities fraud in violation of Section 10 of the Securities Exchange Act of 1934 and Rule 10–b promulgated thereunder, as well as breach of fiduciary duty and unjust enrichment under state law. Defendants moved to dismiss the complaint for failure to state a claim upon which relief can be granted. At the direction of the court defendants'

motion was converted into a motion for summary judgment. Defendants were requested to supply by way of affidavit and supporting documents information relating to each transaction which they conducted on behalf of each of the plaintiff class representatives during the class period. In addition, each party was requested to submit information about market practices and regulatory requirements or advisories concerning transactions such as those which were the subject of the complaint. For the reasons given below, defendants' motion for summary judgment is granted.

## I—PLAINTIFF'S ALLEGATIONS

Defendants in this case, Merrill Lynch Pierce Fenner & Smith, Inc. ("Merrill Lynch"), PaineWebber, Inc. ("PaineWebber") and Dean Witter Reynolds, Inc. ("Dean Witter"), are "integrated broker/dealer" brokerage companies that transact trades both as agents and as principals. Plaintiffs Bruce Zakheim IRA FBO Bruce Zakheim ("Zakheim"), a Merrill Lynch customer, Gloria Binder ("Binder"), a Painewebber customer, and Jeffrey Phillip Kravitz ("Kravitz"), a Dean Witter customer retained defendants to either conduct trades on their behalf or to trade with them directly in various over-the-counter ("OTC") securities.

The gravamen of plaintiffs' complaint is as follows:

1) As agents, defendants relied exclusively on the National Best Bid and Offer ("NBBO"), a price quotation representing the best bid and best offer of any OTC market maker in a particular security on the two-sided NASDAQ market, to fulfill their duty to execute their customers' market orders[1] at the best available price, despite the availability of better prices from a number of sources of liquidity. Those sources included SelectNet[2], Instinet[3], in-house limit orders, in-house market orders, and the SOES limit

---

1. An instruction from a retail customer to buy or sell securities at the best available market price that is distinguished from a "limit order," an instruction to buy or sell at a particular price, specified by the customer.

2. An on-line trading system provided by NASDAQ. See infra at p. 759.

3. Institutional Networks, Inc., a proprietary on-line trading system. See infra at p. 759.

order file.[4] Plaintiffs contend that by failing to take advantage of these other sources and by failing to disclose such neglect, defendants breached a fiduciary duty they owed to plaintiffs by dint of the broker/customer relationship that existed between them. Amended and Consolidated Class Action Complaint ("Amended Complaint") ¶¶ 25–32, 46–49.

2) As principals, defendants not only failed to execute plaintiffs' market orders at the best available price but also employed a number of fraudulent devices to secretly accrue profits for themselves. Failure to disclose both the accrual of such profits and the practice of failing to execute at the best available price, according to plaintiffs, amounted to fraud, Amended Complaint ¶ 42, and a further violation of defendants' fiduciary duty. Amended Complaint ¶ 48. Moreover, defendants were unjust enriched by the accrual of secret profits. Amended Complaint ¶¶ 50–53.

The parties agree that all the transactions in question here were executed by defendants, either as agents or principals, at prices that were equivalent to the NBBO at the time of each transaction. Amended Complaint ¶ 28; Memorandum of Law In Support of Defendants' Motion to Dismiss the Amended Complaint at 7–8; Reply in Support of Defendants' Motion To Dismiss The Amended Complaint at 2; Declaration of Hugh Quigley ¶ 10; Affidavit of Robert Slane ¶ 9; Affidavit of Thomas Dwyer ¶¶ 6–8.

The fraudulent devices alleged by plaintiffs to have been employed by the defendants in their role as principals, are as follows:

1) **Failure to reference sources other than the NBBO when setting prices, as principals, for transactions with retail customers:** By setting the price of their transactions as principals with reference exclusively to the NBBO, defendants arbitrarily made parity with the NBBO the de facto standard for best execution. Because prices superior to the NBBO, from the standpoint of the retail customer, were in fact available from other sources of liquidity at the time of those transactions, defendants were able to establish market positions, both long and short, that were, in fact, better, from their standpoint, than those that represented the "best available price" at any given time. By establishing such superior positions, defendants were able to profit from the difference between the NBBO and the best available price. Amended Complaint ¶ 33.

2) **Failure to cross in-house market orders:** Plaintiffs contend that when defendants received contemporaneous market orders to buy and sell shares in the same stock they systematically failed to execute those orders at a price between the bid and ask, executing each instead at the NBBO quote, thereby appropriating the "spread" between the bid and asked prices on the two-sided NASDAQ market while incurring no risk to themselves. Amended Complaint ¶¶ 34–35.[5]

3) **Failure to cross customers' market orders with in-house limit orders:** Plaintiffs contend that defendants executed customers' market orders at the NBBO despite having received corresponding "limit" orders in the same security from other customers. Defendants thereby appropriated the "spread" while incurring no risk to themselves. Amended Complaint ¶ 36.

4) **Failure to cross customers' market orders with SOES limit orders:** executing orders to either sell or buy shares of particular stocks at the NBBO despite the currency of "limit" orders on the SOES limit order file.[6]

---

4. Small Order Execution System Limit–Order Service. *See infra* at p. 759.

5. Plaintiffs distinguish between situations in which balanced numbers of buy and sell orders are received, Amended Complaint ¶ 34, and situations in which unbalanced orders were received, *Id.,* ¶ 35. The same failure to cross market orders is alleged in both cases. The difference is that in the unbalanced case, defendants are alleged to have taken advantage of another fraudulent device, using the NBBO rather than a better available price on SelectNet or Instinet, with respect to the remaining shares.

6. This device was not alleged in the Amended Complaint. Plaintiffs introduced it in papers supplied in compliance with the court's order converting the motion to dismiss into a motion for summary judgment. Plaintiffs' Supplemental Memorandum at 5; Declaration of Haim Mendelson, ¶ 17(iv) at 9.

**5) Re-trading at the inside price on the "same side" of the spread:** executing market orders to either sell or buy shares of particular stocks at the NBBO quotes despite better prices being available, and then immediately retrading those same shares at those better prices for defendants' own profits, incurring no risk by trading on the same side of spread. Amended Complaint ¶ 37.

**6) Selling order flow:** Without knowledge or consent of the customers placing the orders and in exchange for payments ("payment for order flow"), defendants allegedly routed plaintiffs' market orders to other brokers who failed to execute them at the best available price and who used one or more of the above fraudulent devices to secretly accrue profits to themselves. Amended Complaint ¶ 38.

Plaintiffs bring this class action pursuant to Fed.R.Civ.Proc. 23 on behalf of all those persons who placed market orders with Merrill Lynch, PaineWebber or Dean Witter to purchase or sell shares of OTC stock between November 4, 1992 and November 4, 1994.

## II—MARKET OPERATION

### NASDAO

Over-the-counter trading ("OTC") is, in a sense, the oldest and simplest type of economic exchange: buyer and seller meet outside a formal marketplace, agree on a price and exchange items of economic value. The term derives from a time, long before the advent of computers and electronic communications networks, when some trading in stocks took place in banks where the physical certificates were passed "over-the-counter." *Reshaping The Equity Markets,* Robert A. Schwartz at 47 (HarperBusiness 1991) [hereinafter Schwartz].

In 1971, in an effort to link together geographically dispersed dealers into a single integrated system by exploiting rapidly evolving technologies, Congress created the National Association of Securities Dealers Automated Quotation System ("NASDAQ,", more formally the Nasdaq Market System, Inc.), a subsidiary of The National Associa-

tion of Securities Dealers ("NASD"). The purpose of the NASDAQ was explicitly delineated in the authorizing legislation:

The securities markets are an important national asset which must be preserved and strengthened ... The linking of all markets for qualified securities through communication and data processing facilities will foster efficiency, enhance competition, increase the information available to brokers, dealers, and investors, facilitate the offsetting of investors' orders, and contribute to best execution of such orders.

15 U.S.C. § 78k–1(a)(1)(A) and (D).

The function of a stock exchange is to provide an environment in which the transfer of capital between enterprises can be accomplished at fair prices for minimal cost. One measure of the success of an exchange in fulfilling that role, known as liquidity, is the rapidity and ease with which such transfers can be effectuated. A marketplace with good liquidity affords buyers and sellers the opportunity to locate counterparts willing to trade a wide range of issues at acceptable prices as quickly and efficiently as possible.

In contrast to traditional markets, where liquidity, and thus efficiency and immediacy, are maintained by monopolist "specialists," liquidity on the NASDAQ is maintained by competing dealers, known as "market makers," who hold themselves out to all comers as ready to buy or sell a security for their own account. By making known the price at which they are willing to transact in a particular stock, NASDAQ market makers create a competitive structure in which fair prices are arrived at quickly and efficiently.

To maintain this liquid environment market makers must put their own capital at risk. In order to "foster the risk-taking function of market makers and thereby ... provide free market incentives to active participation in the flow of orders," *Securities Acts Amendments of 1975,* Report of the Committee on Banking, Housing and Urban Affairs, S.Rep. No. 75, 94th Cong., 1st Sess. at 12 (1975), market makers are therefore permitted to buy securities at a "bid" price and to sell them at a higher "ask" price, thus creating what is known as a "two-sided" market. *Plastis v. E.F. Hutton,* No. G86–1030

CA5, 1990 U.S.Dist. LEXIS 4828 (W.D.Mich. Apr. 18, 1990) ("The difference between [the bid and offer] is known as the 'spread,' and represents the market maker's compensation for the transaction."); *Investors Research Corp.*, 1976 SEC LEXIS 2771 (July 19, 1976) ("The spread is [the market maker's] compensation for 'dealing' in a security and risking its capital.").

*The NBBO*

SEC rules require that any NASDAQ dealer that wishes to hold itself out as a market maker in a particular security must continually report the prices at which it is willing to buy and sell the security. 17 C.F.R. § 240.11Ac1–1(c)(1). Once reported, those quotes must be honored up to the "quotation size" ("[t]he number of shares ... that [a market maker] is willing to buy at the bid price or sell at the offer price comprising his bid or offer ..." 17 C.F.R. § 240.11Ac1–1(a)(10)), 17 C.F.R. § 240.11Ac1–1(c)(2).

NASDAQ itself is required to "collect, process and make available ... the highest bid and lowest offer communicated ... by each member ... acting in the capacity of an OTC market maker for each reported security ..." 17 C.F.R. 240.11Ac1–1(b)(1)(ii). This quotation has come to be known as the National Best Bid and Offer ("NBBO").

In accordance with this obligation, NASDAQ operates a quotation reporting system which disseminates market maker quotes over an electronic communications network. There are three levels to this service:

Level 1—Displays the best bid and ask quotes, high, low and last prices and volumes. Does not reveal origin of quotes.

Level 2—Displays the current quotes and the names of the market makers who have entered them.

Level 3—Displays the same information as Level 2 and also allows market makers to enter and to update their quotes.

*SelectNet*

Introduced in November, 1990, SelectNet is an on-line service provided by NASDAQ on which subscribers can negotiate trades and execute orders in OTC securities. In addition to price, offers posted by subscribers can specify size, the period during which the offer is "open," (any period up to 99 minutes or an entire day), and whether the price or size of an order is negotiable. Subscribers may also "preference" their orders, that is, an order may be directed at a specific market maker, at all market makers, or at all subscribers. Offers may be accepted, countered or declined. Subscribers who are not market makers may make their offers anonymously. Market makers must identify themselves.

The thrust of the SelectNet service is to provide an electronic alternative to negotiation by telephone. "The system is offered to NASD members to facilitate negotiation of securities transactions through computer automation, rather than relying on telephone communication." *Market 2000, An Examination of Current Equity Market Developments*, Division of Market Regulation of the SEC, Section IV at 6–7, 1994 SEC LEXIS 135 at *8 (1994) (hereinafter *Market 2000* )

*Instinet*

Institutional Networks, Inc. ("Instinet") is another on-line trading system, similar to SelectNet but differing in two important aspects: 1) it is privately owned and operated; and 2) subscribers, including market makers, may display offers and trade *anonymously*. Traders, particularly large institutions, may therefore conduct large transactions without any revelation of their identity that might induce market reaction against their interest. Orders are accepted from a minimum of 1000 shares to a maximum of 50,000 shares. Although it conducts trades on behalf of clients, Instinet is not a market maker and therefore does not risk its own capital, charging only a commission for its services. *Instinet Corp.*, SEC No–Action Letter, 1992 WL 672345 (S.E.C.) at *2.

*SOES Limit Order File*

In response to the general sentiment that retail customers were not obtaining execution at the best possible price, the SEC created the Small Order Execution System ("SOES") in December, 1984. Participation in SOES was made mandatory for market makers after the October 1987 crash. Sec.Ex. Act Rel. 25,791, 42 SEC Dock. 91 (1988); Sec.Ex. Act

Rel. 26,650, 43 SEC Dock. 790 (1989). Automatic execution on SOES provides small customers with the opportunity to consistently obtain the NBBO by automatically routing orders to the market maker with the best posted bid or offer.

In January, 1989, the SEC introduced the Limit–Order Service, an extension of SOES. The SOES limit book file, as this service came to be known, allows both GTC (good till canceled) and day limit orders of one thousand shares or less to be accepted, stored, and automatically executed when a market maker's quote reaches or exceeds a limit order price. A small customer can therefore be assured of obtaining execution at a given price if the market, in the form of the NBBO, reaches that level.

### In-house limit and market orders

Individual integrated firms, functioning as either agents or principals, receive orders to both buy and sell securities in the course of the trading day. When either a limit or market order is received before a "corresponding" order is executed, the possibility exists that the two orders could be matched, or "crossed" at a price midway between them. "Call market" trading systems employed in some foreign countries, e.g., Austria, Belgium, Germany and Israel, as opposed to "continuous" trading systems employed on the United States financial markets (both securities exchanges and the OTC markets), regularly utilize this type of order crossing by periodically batching corresponding offers for simultaneous execution at a single "clearing" price:

> "[O]rders for an issue are revealed to an auctioneer when the market is called. Buy and sell orders are matched at the price that most closely equates the aggregate number of shares offered for sale (at that price and below) with the aggregate number of shares sought for purchase (at that price and above). Then, all market orders to buy and all buy limit orders at the clearing price or higher are executed, as are all market orders to sell and all sell limit orders at the clearing price or lower."

Schwartz at 181.

It is the contention of plaintiffs in this action that defendants were obligated to conduct such a call market whenever an outstanding market or limit order remained unexecuted upon receipt of corresponding market order. Amended Complaint ¶¶ 34–36.

### Duty of Best Execution

The relationship between a broker/dealer and its customer gives rise to "certain fiduciary obligations." *In re E.F. Hutton & Co.*, Securities Exchange Act Release No. 25887, [1988 Transfer Binder] Fed. Sec.L.Rep. (CCH) ¶ 84,303, 89,326 at 89,328 and n. 9 (July 6, 1988) (citing Restatement (Second) of Agency ¶ 1 (1957)). Amongst those obligations is a duty to execute the customer's order at the best available price. *Payment For Order Flow*, Exchange Act Release No. 34902 [1994 Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 85,444, 85,849 at 85,854 n. 28. (*"Payment for Order Flow Release No. 34902 "*). That agency obligation, moreover, does not dissolve when the broker/dealer acts in its capacity as a principal. "A broker/dealer's determination to execute an order as a principal or agent cannot be 'a means by which the broker may elect whether or not the law will impose fiduciary standards upon him in the actual circumstances of any given relationship or transaction.'" *In re E.F. Hutton* at 89,328 (quoting *Opper v. Hancock Securities Corp.*, 250 F.Supp. 668, 675 (S.D.N.Y.), *aff'd,* 367 F.2d 157 (2d Cir.1966)). Avoidance of any conflict of interest is central to public confidence in the various markets. "The integrity of the industry can be maintained only if the fundamental principle that a customer should at all times get the best available price which can reasonably be obtained for him is followed." *The Report Of The Special Study of Securities Markets*, H.R.Doc. No. 95, 88th Cong., 1st Sess., pt. II, 624 (1963).

The central issue in this case is precisely what is entailed by the duty of best execution. Any act done in good faith in conformity with an SEC rule cannot result in liability under Section 10 (Manipulative and Deceptive Devices and Contrivances). 15 U.S.C. § 78w(a)(1) ("No provision of this chapter imposing any liability shall apply to any act done or omitted in good faith in

conformity with any rule or regulation of the Commission ... [or] any self-regulatory organization ..."). The Second Circuit has extended this doctrine to the Commission's interpretations of its own rules. *Gerstle v. Gamble–Skogmo, Inc.,* 478 F.2d 1281, 1294 (2d Cir.1973). Failure to comment or a no-action letter from the SEC does not constitute an interpretation by the Commission. *SEC v. Falstaff Brewing Corp.,* [1978 Transfer Binder] Fed.Sec.L.Rep. (CCH) § 96,583, at 94,473, 1978 WL 1120 (D.D.C.1978), *aff'd* 629 F.2d 62 (D.C.Cir.), cert. denied sub nom. *Kalmanovitz v. SEC,* 449 U.S. 1012, 101 S.Ct. 569, 66 L.Ed.2d 471 (1980); *Langert v. Q–1 Corp.,* [1973–1974 Transfer Binder] Fed.Sec. L.Rep. § 94,445, at § 95,540, 1974 WL 377 (S.D.N.Y.1974).

The difficulty here is that neither Congress, the SEC nor the NASD has issued a definitive statement on point concerning the use of the NBBO as satisfaction of the duty of best execution.[7] Lacking such a pronouncement, the parties rely on various sources of to bolster their respective interpretations of the content of that duty as it existed during the class period.

### Defendants' Best Execution Sources

In support of their contention that the duty of best execution is categorically satisfied by reference the NBBO defendants cite the following sources:

1) The NASD Manual: "In any transaction for or with a customer, a [broker-dealer] ... shall use reasonable diligence to ascertain the best inter-dealer market for the subject security and buy or sell in such market so that the resultant price to the customer is as favorable as possible under prevailing conditions." *Interpretation of the Board of Governors on Execution of Retail Transactions in the Over–The–Counter Market,* NASD Rules of Fair Practice, Art. III, Section 1, NASD Manual (CCH) ¶ 2151.03.

Defendants contend that the NASDAQ Level 2 was the "best inter-dealer market" and the NBBO was the most favorable "resultant price." Memorandum of Law In Support of Defendants' Motion To Dismiss The Amended Complaint at 18.

2) An investigatory report compiled by the SEC's Division of Market Regulation: "[I]t is reasonable to accept quote-based executions of market orders based on the NASDAQ best bid or offer as consistent with best execution, absent customer instructions to the contrary." *Market 2000,* Study V at 5, 1994 SEC LEXIS 136 at *15.

3) An SEC regulation on the SOES system: "SOES orders are executed in rotation against [ ] market makers at the inside bid or ask." *Self–Regulatory Organization; National Association of Securities Delers, Inc.,* Exchange Act Release No. 34–33377, 58 Fed. Reg. 69419 (Dec. 23, 1993). Defendants contend that SEC sanction of the SOES system, with its automatic execution at the NBBO, implies SEC approval of use of SOES to satisfy best execution. Defendants' Memorandum Of Law In Support Of Motion To Dismiss at 21. Plaintiffs counter that use of SOES satisfies best execution only when a broker/dealer has diligently ascertained that a better price is not available: "[A] broker-dealer routing customer orders for automated execution could satisfy its best execution obligations so long as the broker-dealer assesses periodically the quality of competing markets ..." Plaintiff's Memorandum Of Law In Opposition To Defendants' Motion To Dismiss The Amended Complaint at 33–34 and *Payment For Order Flow Release No. 34902* at 85,854.

4) A report to the Board of Governors of the NASD: "[The committee] believes that when orders are executed at the best current displayed bid or offer that investors receive best execution of their small-sized orders ..." *Inducements for Order Flow,* A Report to the Board of Governors, National Associa-

---

**7.** Plaintiffs fail to allege any damage based on their "cross trades" theories. *See infra* at pp. ————. Accordingly, the discussion here is confined to those counts of the Amended Complaint that concern adherence to the NBBO. Amended Complaint ¶¶ 30–33, 37 and 39–53.

The theory of damage contained in Count 38 of the Amended Complaint, concerning payment for order flow to firms that allegedly were guilty of the same fraudulent conduct as defendants, is dependent on plaintiffs' primary theories of damage. Accordingly, the discussion here is confined to the underlying damage theories.

tion of Securities Dealers at 28 (July 1991). Plaintiffs contend the SEC expressly disavowed this statement, noting that "such interpretation of best execution in all circumstances may not be consistent with previous statements of the Commission regarding best execution." *Payment for Order Flow*, Exchange Act Release No. 33206 [1993 Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 85,234, at 84,542 n. 29 (Oct 6, 1993).

5) The affidavit of the General Counsel of the NASD: "The NASD has viewed [execution at the NBBO] as consistent with the duty of 'best execution' that broker-dealers assume when they accept customer orders." Declaration of T. Grant Callery, ¶ 4. "The NASD has not in the past adopted any rules that required market makers to 'cross' market orders with in-house limit orders rather than execute those orders at the NBBO. The NASD also has not required market makers to seek execution of market orders at prices reflected in the Instinet or SelectNet system." *Id.*, ¶ 5.

6) The affidavit of a former chairman of the SEC: "It has long been the understanding in the securities industry that investors receive best execution when their small OTC orders are executed at the NBBO. It is the general custom and practice of firms in the industry to execute such orders at the NBBO." Affidavit of David S. Ruder, ¶ 3.

*Plaintiffs' Best Execution Sources*

In support of their contention that defendants were obligated to look beyond the NBBO when satisfying the duty of best execution which they owed to their retail customers, plaintiffs cite the following:

1) An SEC report to Congress: "For a firm which executes customer orders from an inventory accumulated in the course of making a market . . . its obligation in checking markets involves reasonably assuring that the customer pays or receives a net price not disadvantageous in respect of the price available elsewhere." *The Report Of The Special Study of Securities Markets*, H.R.Doc. 95, 88th Cong., 1st Sess. Pt. II, 616 (1963).

2) Two SEC regulations regarding payment for order flow: "[While] brokers have not been held . . . to an absolute requirement

of achieving the most favorable price on each order[,] [w]hat has been required is that the broker endeavor, using due diligence, to obtain the best execution possible given all the facts and circumstances." *Payment For Order Flow*, Exchange Act Release No. 33206 [1993 Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 85,234, 84,536 at 84,541 (Oct. 6, 1993) (quoting *Second Report on Bank Securities Activities: Comparative Regulatory Framework Regarding Brokerage–Type Services* 97–98, 98 n. 233 (Feb 3, 1977)) *as reprinted in* Senate Comm. on Banking, Housing and Urban Affairs, 95th Cong., 1st Sess., *Report on Bank's Securities Activities of the SEC* 145, 251–52, 252 n. 233 (Comm. Print 1977).

"[T]he Commission's staff recently has warned against presuming that guaranteed executions at the best bid or offer always will satisfy the broker-dealer's best execution duties for small orders in listed securities." *Payment For Order Flow Release No. 34902* at 85,849 (referring to *Market 2000*, Study V at 4).

3) An NASD Notice to Members: "[I]f the market maker executes trades immediately surrounding its retail sales, such as comparable sales to a non-market maker at a price lower than the inside ask, the use of these actual sale prices may be required to arrive at the prevailing market price." *Special NASD Notice to Members Re: Policies and Procedures For Markups*, 1992 NASD LEXIS 47 at *14 (Apr. 1, 1992).

4) The affidavit of a former member of the Board of Governors of the NASD: "[I]t is my understanding and opinion that a broker-dealer's execution of a customer market order at the NBBO when superior prices are otherwise reasonably available does not comport with the duty of best execution." Declaration of Junius W. Peake, ¶ 5.

5) The affidavit of a former Commissioner of the SEC: "It is my opinion, during the Class Period, absent customer instructions to the contrary, a broker-dealer failed to fulfill its duty of best execution to a customer if the broker-dealer did not execute the customer's order at a reasonable available superior price, including such a price available on

Instinet or SelectNet ... and instead executed the order at the NBBO." Declaration of Richard Y. Roberts, ¶ 7.

6) The affidavit of a retired OTC securities trader: Paul M. Lacy was an over-the-counter trader for thirty-two years prior to his retirement in 1990. "[I]n order to meet [the fiduciary obligation to obtain the best price available], before I executed any market order for a retail customer to buy or sell OTC securities in which [my employer] made a market, in addition to monitoring the NBBO price displayed on NASDAQ, it was my custom and practice to check prices available from alternative sources including (1) any open orders for that security; (2) any day orders for that security; (3) other in-house market orders for the same security that could be crossed; and (4) contacts with fellow traders at competing broker-dealers firms ... Beginning in the late 1980's ... I began also to check Instinet quotations prior to executing any retail customer market orders to buy or sell the NASDAQ stocks in which I made a market." Declaration of Paul M. Lacy, ¶¶ 5 and 8.

The parties contentions notwithstanding, none of these sources represents a law, regulation or interpretation of a regulation which directly addresses the question of whether or not a broker/dealer's duty of best execution was satisfied by exclusive reference to the NBBO during the class period. While these statements may be helpful, absent an unequivocal pronouncement on point, it must be independently determined whether circumstances as they existed during the class period imposed a standing obligation on the defendants to refer to sources other than the NBBO in fulfilling the duty of best execution that they owed to plaintiffs, and, if so, whether failure to refer to such other sources, *ipso facto,* constituted securities fraud.

### III—PROPOSED RULES ANNOUNCED SUBSEQUENT TO THE CLASS PERIOD

*SEC Proposed Rules—Order Execution Obligations*

Both parties point to the recent release of a set of proposed rules by the SEC in support of their interpretation of broker obligations existing during the class period.

On September 29, 1995, the SEC proposed rules that would amend Rule 11Ac1–1 to require market makers to include "any better prices that they quote privately through certain electronic communications networks" in their best bid and offer quote. "The [proposed] amendments are designed specifically to address what the Commission believes to be the potential for market makers to quote one price to public investors but to publish firm quotes in private systems at better prices." *Order Execution Obligations—Proposed Rules,* SEC Release No. 34–36310 at 22, (Sept. 29, 1995) (hereinafter *Order Execution Obligations* ).

The proposed rule does not directly comment on satisfaction of the duty of best execution through use of the NBBO. "The rules proposed today ... are not intended to alter or displace the well-established duty under the antifraud principles for market participants to provide customers with best execution." *Id.* at 10. Instead, the intended effect is achieved by modifying the NBBO itself: reference to the "new" NBBO will produce prices equivalent to the best available prices the broker/dealer is offering not only on the NASDAQ Level 2, but on SelectNet and Instinet. *Id.* at 22.

The proposed rule is explicitly prospective. "The Commission is proposing to include *prospectively* within the definition of 'bid' or 'offer' under the Quote Rule priced orders that market makers enter into widely disseminated electronic communications networks, thereby requiring market makers to include such orders in the bids and offers they communicate to their exchange or association for reflection in their published quotations." *Id.* at 24.

Also included in the proposed rule is a requirement that exchange specialists and OTC market makers include in-house customer limit orders in the determination of their published quotes. *Id.* at 40. By requiring dealers to "expose" their customers' limit orders, thereby incorporating them into the NBBO, the SEC has proposed to implement a practice which plaintiffs contend de-

fendants were obligated to follow during the class period. Amended Complaint ¶ 36.

*NASD Proposed Rule—NAqcess*

Plaintiffs also point to the release of a proposed rule change by the NASD, seeking to set up a small order execution system to supersede SOES. The new system, entitled "NAqcess," would provide greater protection for the public's limit orders and afford public market orders the opportunity for price improvement, the ability to transact "between the spread" at purchase prices lower than the inside "ask" price, and sale prices higher than the inside "bid" price, by allowing customers to specify that an order be entered into NAqcess where it would interact with other limit and market orders without the participation of a market maker. *Proposed Rule Change,* File No. SR–NASD–95–42, National Association of Securities Dealers at 3–4 (Sept. 18, 1995).

The proposed rule parallels plaintiffs contention that defendants should have allowed in-house limit and market orders to interact without defendants' participation. Amended Complaint ¶¶ 34–36.

Defendants assert that the prospective nature of both pronouncements is supportive of their contention that no obligations similar to those described in the new rules existed prior to their proposal by the SEC and NASD. Defendant PaineWebber's Supplemental Brief In Support Of Motion For Summary Judgment at 14–16.

## IV—SPECIFIC TRANSACTIONS

Thirteen trades were conducted by defendants on behalf of plaintiff class representatives during the class period. The details of those transactions are as follows:

| Trans. Date | Defendant | Plaintiff | Role | Type | Shares | Security | Price |
| --- | --- | --- | --- | --- | --- | --- | --- |
| Aug 19, 1993 | PaineWebber | Binder | agent | purchase | 7000 | Hydron Tech. | 2⅝₆ |
| Apr 21, 1994 | PaineWebber | Binder | agent | purchase | 1000 | Optical Radiation | 20 |
| July 18, 1994 | PaineWebber | Binder | agent | sale | 1000 | Optical Radiation | 22¼ |
| Nov 10, 1993 | Dean Witter | Kravitz | agent | purchase | 100 | Cellular | 28 |
| Nov 10, 1993 | Dean Witter | Kravitz | agent | sale | 262 | IDB Comm. | 45 |
| Oct 20, 1993 | Dean Witter | Kravitz | agent | purchase | 100 | Iwerks | 34¾ |
| Sept 21, 1994 | Dean Witter | Kravitz | agent | purchase | 100 | Safety Components | 19 |
| Aug 25, 1993 | Dean Witter | Kravitz | agent | purchase | 100 | Scientific Games | 18 |
| Feb 11, 1994 | Dean Witter | Kravitz | agent | purchase | 100 | Simpson Industries | 22½ |
| Feb 1, 1994 | Dean Witter | Kravitz | princ. | purchase | 100 | Envoy | 19¼ |
| Dec 29, 1993 | Dean Witter | Kravitz | princ. | sale | 100 | Spectrum | 7½ |
| June 7, 1994 | Merrill Lynch | Zakheim | princ. | purchase | 120 | US Healthcare | 42¾ . |

Defendants acted as market makers in three of the thirteen transactions: plaintiff Kravitz's Feb. 1, 1994 and Dec. 29, 1993 transactions with Dean Witter and plaintiff Zakheim's June 7, 1994 transaction with Merrill Lynch. The remaining ten transactions were conducted by defendants as agents. Only those counts of the complaint which address defendants' conduct as agents, that is, those counts that allege failure to obtain the best available price and the fraudulent sale of order flow to market makers who in turn derived secret profits, Amended Complaint ¶¶ 30–31 and 38, are applicable to the remaining ten transactions.

Damage (if the plaintiffs' theory of liability is accepted) is definitively shown in only one transaction:

Plaintiff Binder's April 21, 1994 purchase order for 1000 shares of Optical Radiation was placed by defendant PaineWebber, as agent, with Prudential Securities, a market maker in Optical Radiation stock. Affidavit of Thomas Dwyer, ¶¶ 2 and ¶ 7. Prudential entered the order at 14:22:54 and executed the transaction approximately 6 minutes later, at 14:29:00, for a price of 20. *Id.,* Exhibit 2 at 1. A "day" offer, that is, an offer that is good for the entire trading day, to sell 2000 shares of Optical Radiation in blocks of 1000 shares at 19¾ was broadcast on SelectNet to all market makers in that security at 10:19:06. Certification of Karen L. Barr, Exhibit A at page "2357." As a day order broadcast to all market makers, that order was available to Prudential Securities. Because Prudential executed Binder's order at the NBBO of 20 rather than accepting the open SelectNet day offer at 19¾, Binder was charged ¼ more per share than she would

have had the SelectNet offer been accepted. The resulting net damage was $25 on the 1000–share transaction. Failure to disclose the routing of a market order to another brokerage firm that executed the order at the NBBO while a superior price was available on SelectNet constitutes the type of conduct which plaintiffs allege is a fraud. Amended Complaint ¶¶ 31 and 38.

In two other transactions there is evidence of damage of a more indirect, somewhat speculative nature:

1) Plaintiff Binder's August 19, 1994 purchase order for 7000 shares of Hydron Technologies was placed by defendant Paine-Webber with Reich & Co., a current market maker in Hydron Technologies. Affidavit of Thomas Dwyer, ¶¶ 2 and 6. Reich & Co. entered the order at 13:31:00 and executed it approximately 17 minutes later at 13:48:28 at a price of 2⁹⁄₁₆. *Id.,* Exhibit 2 at 2. An offer preferenced to Lehman Bros. (and therefore not available to Reich & Co.) to sell any quantity of Hydron Technologies up to 3000 shares at a price of 2½ was entered on Select-Net at 13:30:32. The offer was good for three minutes. Certification of Karen L. Barr, Exhibit A, page "1338." Plaintiffs contend that the existence of the Lehman Bros. offer, although not available to Reich & Co. should have served as the reference price by which Reich set the price of its own transaction with Binder. "[T]he contemporaneous availability of a superior price on SelectNet, although not available for Binder's order, indicates that a superior price may have also been available on Instinet." Reply Declaration of Haim Mendelson, ¶ 33 at 13–14. The differential of ¹⁄₁₆ between the NBBO and preferenced SelectNet price resulted in net damage to Binder of $437.50 on the 7000–share transaction.

2) Plaintiff Zakheim's June 7, 1994 purchase order for 120 shares of U.S. Healthcare was executed by defendant Merrill Lynch, as principal, at 11:11:54 for a price of 42¾. Twenty-nine of Merrill Lynch's thirty-four trades in USHC conducted on June 7, 1994 on Instinet were executed at prices better than NBBO. Reply Declaration of Haim Mendelson, ¶¶ 10–11 at 6–7. The average price improvement over these thirty-four transactions was $0.16 per share. Plaintiffs contend that this creates an inference "that it is more likely than not that a better price was available on Instinet between the times Merrill Lynch received and executed Mr. Zakheim's order." Id., ¶ 12 at 7. Based on the average price improvement demonstrated in the thirty-four transactions, Zakheim's damage was $19.20 on the 120–share transaction.

With respect to this June 7, 1994 transaction, plaintiffs allege an additional theory of damage. No in-house market orders were available for crossing with Zakheim's market order at or about the time this trade was executed. Reply Declaration of Haim Mendelson, ¶ 14 at 7. Plaintiffs contend, however, that market orders of other Merrill Lynch customers could have been crossed with each other at the start of trading on the same day. For example, two unexecuted market orders to buy 450 shares in total and two unexecuted market orders to sell 305 shares in total were held by Merrill Lynch as of 9:27:35 on June 7, 1994. Plaintiffs contend that 305 shares could have been exchanged at a price midway between the respective offers at that time without Merrill Lynch's participation in the current spread. *Id.,* ¶¶ 15–16 at 8. At the time, the NBBO bid price was 41½ and the NBBO ask price was 41¾, yielding a spread of ¼. Zakheim's loss under this theory is based on one-half of the spread which Merrill would have gained by selling to Zakheim at the NBBO asking price rather than crossing his order with another in-house market order, had one been available, at a price midway between NBBO bid and ask. The resultant damage calculation is $15 on the 120–share transaction. This damage theory fails to recognize that widely accepted principle, noted by plaintiffs themselves, Plaintiff's Memorandum In Opposition at 43, n. 32, that class representatives cannot rely upon injury to absent class members but must allege personal injury. *Warth v. Seldin,* 422 U.S. 490, 493, 95 S.Ct. 2197, 2202, 45 L.Ed.2d 343 (1975); *Cent'l Wesleyan College v. W.R. Grace & Co.,* 6 F.3d 177, 188 (4th Cir.1993); *Casey v. Lewis,* 4 F.3d 1516, 1519 (9th Cir.1993); *Griffin v. Dugger,* 823 F.2d 1476, 1482 (11th Cir.1987), *cert. denied,* 486

U.S. 1005, 108 S.Ct. 1729, 100 L.Ed.2d 193 (1988); *Brown v. Sibley,* 650 F.2d 760, 771 (5th Cir.1981).

No information on either Instinet prices [8], SOES limit order file prices or payment for order flow arrangements was supplied for any of the transactions.

Data on contemporaneous Selectnet prices were supplied in six other transactions [9] but no available superior price was shown in any of them. For example, on Sept. 21, 1994, the day of plaintiff Kravitz's 100 share purchase of Safety Components executed by Dean Witter as agent at a price of 19, three SelectNet offers for Safety Components were posted:

1) At 10:18:28 an offer to sell any quantity of 600 shares or less at a price of 18¾, good for three minutes, was broadcast to all market makers. The offer was accepted (for all 600 shares at the offered price) at 10:19:21.

2) At 11:07:11 an offer to sell any quantity of 600 shares or less at a price of 18½, good for three minutes, was broadcast to all market makers. The offer was accepted (for all 600 shares at the offered price) at 11:07:25.

3) At 15:39:41 an offer to purchase exactly 1000 shares at a price of 17¾, good for three minutes, was broadcast to all market makers. The offer was withdrawn nineteen seconds later at 15:40:00 without being accepted.

At the time the Kravitz's order was executed by Dean Witter on the SOES system, 13:10, none of the day's three SelectNet orders were open and available. Therefore, with respect to SelectNet, plaintiff Kravitz suffered no damage in this transaction. It is conceivable, but not established, that Instinet or the SOES limit order would show better prices in the transactions for which Select-Net data was supplied as well as in the remaining three transactions [10] for which no information on any alternative sources of liquidity was provided.

According to plaintiffs, "[T]hroughout the Class Period [November 4, 1992 to November 4, 1994], each Defendant *daily* took *tens of thousands* of relatively small orders from their respective retail customers, including Plaintiffs and members of the Class, to buy and sell *tens of millions* of shares of stock." Amended Complaint ¶ 25 (emphasis added). The foregoing examples of just a few of plaintiffs' transactions suggest i) that determining damages under plaintiffs' theory would be no easy task and, ii) more important, the additional inquiries which would have to be made when executing each defendant's tens of thousands of daily relatively small orders might be so time consuming and burdensome that customers would be prejudiced through the inability of broker/dealers to execute customer orders in a timely and inexpensive manner. These considerations must be among those which are causing the regulatory agencies to move with care when devising new rules on this subject. These

---

**8.** Merrill Lynch provided a "TMTR Trade Report" showing "the time and place of transactions by all market makers in U.S. Healthcare at or around the time of [plaintiff Zakheim's June 7, 1994] transaction." Declaration of Hugh Quigley, ¶ 5. Although some of those transactions took place on Instinet, "[b]ecause of the NASD reporting rules, a large number of transactions executed through Instinet will not [be labelled as such in] the TMTR Trade Report and hence will not be identifiable as Instinet transactions." Reply Declaration of Haim Mendelson, ¶ 8(b) at 5. Thus although some Instinet information is provided in this TMTR Trade Report, it is incomplete no inference on contemporaneous Instinet activity can be drawn.

**9.** July 18, 1994 (Binder sale of 1000 shares of Optical Radiation through PaineWebber as agent);

Oct. 20, 1993 (Kravitz purchase of 100 shares of Iwerks Entertainment through Dean Witter as agent);

Sept. 21, 1994 (Kravitz purchase of 100 shares of Safety Components through Dean Witter as agent);

Feb 11, 1994 (Kravitz purchase of 100 shares of Simpson Industries through Dean Witter as agent);

Feb 1, 1994 (Kravitz purchase of 100 shares of Envoy CP with Dean Witter as principal); and

Dec. 29, 1993 (Kravitz sale of 100 shares to Spectrum Information Technologies to Dean Witter as principal).

**10.** Nov. 10, 1993 (Kravitz purchase of 100 shares of Cellular through Dean Witter as agent);

Nov. 10, 1993 (Kravitz sale of 262 shares of IDB Communications through Dean Witter as agent); and

Aug. 25, 1993 (Kravitz purchase of 100 shares of Scientific Games through Dean Witter as agent).

considerations must also be a reason why the proposed new rules appear to be moving in the direction of modifying the computation of the NBBO rather than imposing additional duties of inquiry upon broker/dealers.

Giving the non-moving party the benefit of the doubt, as is required under summary judgment standards, I will assume, arguendo, that the missing data would reveal some damage in a sufficient number of the transactions to surmount the standing challenge. Such "damages," of course, assume the validity of plaintiffs' substantive claims.

### E.—DISCUSSION

#### Standard For Summary Judgment

A court must grant summary judgment if the moving party establishes that "there is no genuine issue as to any material fact and that ... [it] is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). Once the moving party has carried its burden under Rule 56(c), "its opponent must do more than simply show that there is some metaphysical doubt as to the material facts in question." *Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986), *rev'g* 723 F.2d 238 (3d Cir.1983). The opposing party must set forth specific facts showing a genuine issue for trial, and may not rest upon the mere allegations or denials of its pleadings. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 324, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986); *First National Bank v. Cities Service Co.*, 391 U.S. 253, 289, 88 S.Ct. 1575, 1592–93, 20 L.Ed.2d 569 *reh'g denied*, 393 U.S. 901, 89 S.Ct. 63, 21 L.Ed.2d 188 (1968); *Sound Ship Bldg. Corp. v. Bethlehem Steel Co*, 533 F.2d 96, 99 (3d Cir.), *cert. denied*, 429 U.S. 860, 97 S.Ct. 161, 50 L.Ed.2d 137 (1976). In applying Rule 56(c), the Supreme Court has held that:

By it very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact.

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, at 247–48, 106 S.Ct. 2505, at 2510, 91 L.Ed.2d 202 (1986).

A genuine issue for trial is present whenever "the evidence presents a sufficient disagreement to require submission to a jury." *id.* at 251–252, 106 S.Ct. at 2512. In contrast, whenever "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita*, 475 U.S. at 587, 106 S.Ct. at 1356. In evaluating the record, the court must both weigh the evidence and draw inferences from it "in the light most favorable to the party opposing the motion." *Whitehead v. St. Joe Lead Co., Inc.*, 729 F.2d 238, 251 (3d Cir.1984) (quoting *Coastal States Gas Corp. v. Department of Energy*, 644 F.2d 969, 979 (3d Cir.1981)); *Wahl v. Rexnord, Inc.*, 624 F.2d 1169, 1181 (3d Cir.1980).

A material fact for each party is one which assists in "establish[ing] the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp.*, 477 U.S. at 322, 106 S.Ct. at 2552. Although it has been advised that "summary judgment should be used sparingly in complex ... securities litigation where motive and intent play lead roles and the proof is largely in the hands of the defendants," *Allen Organ Co. v. North American Rockwell Corp.*, 363 F.Supp. 1117, 1124 (E.D.Pa.1973), if a party fails to establish an essential element upon which it will bear the burden at trial "there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the non-moving party's case necessarily renders all other facts immaterial." *Celotex Corp.*, 477 U.S. at 323, 106 S.Ct. at 2552.

#### Fraud under Section 10(b) and Rule 10b–5

In fulfillment of the Congressional purpose "to substitute a philosophy of full disclosure for the philosophy of caveat emptor ..." *SEC v. Capital Gains*, 375 U.S. 180, 186, 84 S.Ct. 275, 280, 11 L.Ed.2d 237 (1963), and pursuant to the authority granted it in Section 10 of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(a), the Securities and

Exchange Commission has defined fraudulent use of "manipulative and deceptive devices" in the context of the securities industry:

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,

(a) To employ any device, scheme, or artifice to defraud,

(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person,

in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b–5.

 The parallel to common law fraud is not coincidental: "The federal securities statutes were modeled after the common law actions of fraud and deceit." *Gochnauer v. A.G. Edwards & Sons, Inc.*, 810 F.2d 1042, 1049 (11th Cir.1987). In order to prevail on a section 10b–5 claim, a plaintiff must show that:

1 a security was sold or purchased accompanied by a misrepresentation or omission of a material fact

2 defendant acted with scienter

3 the plaintiff justifiably relied on such misrepresentation in connection with the purchase or sale of a security; and

4 the plaintiff suffered damage as a result of the misrepresentation or omission.

*Sowell v. Butcher & Singer, Inc.*, 926 F.2d 289, 296 (3rd Cir.1991). Failure to disclose a material fact is a misrepresentation. *Chiarella v. United States*, 445 U.S. 222, 229, 100 S.Ct. 1108, 1115, 63 L.Ed.2d 348 (1979); *Rochez Bros., Inc. v. Rhoades.*, 491 F.2d 402, 407–8 (3d Cir.1973). Where a reasonable man would attach importance to facts in determining his choice of action in the transac-

tion in question, the facts are material. *List v. Fashion Park, Inc.*, 340 F.2d 457, 462 (2d Cir.) *cert. denied* 382 U.S. 811, 86 S.Ct. 23, 15 L.Ed.2d 60 (1965). Scienter is a necessary element in actions brought under Section 10 and Rule 10b–5. *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 199, 96 S.Ct. 1375, 1384, 47 L.Ed.2d 668 (1976) ("The words 'manipulative or deceptive' used in conjunction with 'device or contrivance' strongly suggest that § 10(b) was intended to proscribe knowing or intentional misconduct."). Conduct that is an "extreme departure from the standards of ordinary care," *Shivangi v. Dean Witter Reynolds, Inc.*, 825 F.2d 885, 889 (5th Cir. 1987), may be sufficiently reckless to also form scienter. *Sundstrand Corp. v. Sun Chemical Corp.*, 553 F.2d 1033, 1045 (7th Cir.1977); *McLean v. Alexander*, 599 F.2d 1190, 1197 n. 12 (3d Cir.1979).

*Misrepresentation*

A broker/dealer owes a fiduciary duty to a retail customer. "[T]he duties of a securities broker are, if anything, more stringent than those imposed by general agency law. All that is necessary [to show fraud based on those duties] is to hold defendant to standards that would govern an agent for the sale of potatoes." *Opper*, 250 F.Supp. at 676; *In re Kidder, Peabody & Co., Inc.*, 43 S.E.C. 911, 915 (1968).

 The fiduciary duty is fundamental to the broker/client relationship:

[W]hen one is engaged as agent to act on behalf of another, the law requires him to do just that. He must not bring his own interests into conflict with his client's. If he does, he must explain in detail what his own self-interest in the transaction is in order to give his client an opportunity to make up his own mind whether to employ an agent who is riding two horses.

L.Loss, *The SEC and the Broker–Dealer*, 1 Vand.L.Rev. 516, 522 (1948). Although it might grow out of broker/dealers' role as agent, the duty does not disappear when the role of principal is assumed. "A broker-dealer's determination to execute an order as principal or agent cannot be 'a means by which the broker may elect whether or not

the law will impose fiduciary standards upon him in the actual circumstances of any given relationship or transaction.' " *E.F. Hutton & Co.,* Securities Exchange Act Release No. 25887, Fed.Sec.L.Rep. (CCH) ¶ 84,303, 89,-326, 89,328 (July 6, 1988) (*quoting Opper,* 250 F.Supp. at 675).

The fiduciary duty gives rise to a duty to disclose information in the sole possession of the agent in various circumstances.

[A]dministrative and judicial interpretations have established that silence in connection with the purchase or sale of securities may operate as a fraud actionable under § 10(b) despite the absence of statutory language or legislative history specifically addressing the legality of nondisclosure ... [S]uch liability is premised upon a duty to disclose arising from a relationship of trust and confidence between parties to a transaction.

*Chiarella,* 445 U.S. at 230, 100 S.Ct. at 1115. "In circumstances where a broker-dealer's interests conflict with those of the customer ... [the broker must] disclose all material information to enable the customer to make an informed decision regarding whether to complete the transaction." *Market 2000,* Study V at *2.

No express representation is alleged to have been made to any of the plaintiffs in the present case, but defendants concede that "by holding themselves out as professionals, brokers make an implicit representation to the public that they [will] charge customers 'fair' prices ..." Defendants' Memorandum In Support of Motion to Dismiss at 31. The crux of the dispute represented by this litigation is disagreement over the meaning of the term "fair" in this context. Plaintiffs allege that defendants' implied representation of fair dealing, upon which they relied, included an obligation, pursuant to the fiduciary nature of the relationship between them, to disclose the material fact that defendants intended to execute plaintiffs' orders at the NBBO rather than at superior available prices in order to satisfy their duty of best execution. Amended Complaint §§ 31–32. The use of various manipulative devices to secretly accrue profits for their own accounts, according to plaintiffs, amounted to a

further breach of the duty to disclose and thus a further fraud. Amended Complaint §§ 33–38. Defendants, on the other hand, maintain that "fair" simply means execution at prices no worse than the current NBBO and that such transaction is equivalent to best execution.

■ This requires a review of the duty of best execution. Neither party disputes that "fairness" includes a duty of best execution, but the term itself eludes definition: despite its central nature, it inhabits the texts of securities law without revealing its source. "[T]he Commission has not promulgated a separate best execution rule or explicitly defined best execution ..." *Market 2000,* Study V at *5–6. While Congress, in establishing the NASDAQ, attempted to assure "the practicability of brokers executing investors' orders in the best market," 15 U.S.C. § 78k–1(a)(1)(C)(iv), the duty is ultimately founded in common law:

A broker-dealer's duty to seek to obtain the best execution of customer orders derives from the common law agency of loyalty, which obligates an agent to act exclusively in the principal's best interest ... [the agent] is under a duty to exercise reasonable care to obtain the most advantageous terms for the customer.

*Market 2000,* Study V at *2 *quoting* Restatement 2d of Agency §§ 387 and 424 (1958).

■ This common law has spawned various interpretative rules when applied to the various securities markets. *See, e.g.,* American Stock Exchange Rule 156(a), 2 Amex Guide (CCH) P 9296, and New York Stock Exchange Rule 123A.41, 2 NYSE Guide (CCH) P 2123A (requiring members handling market orders to exercise diligence to execute orders at the best prices available). The corresponding NASD rule, cited by defendants, however, exemplifies the imprecision of these rules and the difficulty of using them to clarify the precise meaning of best execution with respect to exclusive use of the NBBO. The NASD rule reads:

In any transaction for or with a customer, a member ... shall use reasonable diligence to ascertain the best inter-dealer market for the subject security and buy or

sell in such market so that the resultant price to the customer is as favorable as possible under prevailing market conditions.

NASD Rules of Fair Practice, NASD Manual (CCH), Art. III, Sect. 1, ¶ 2151.03. Since a broker/dealer may transact in the same security with a market maker on any one of a number of execution systems, some of which yield different prices, guidance limited to a requirement to determine which market maker is giving the best price when market makers themselves are offering different prices on different systems, can hardly be called helpful.

To add to the difficulty, "best execution" does not necessarily mean "best price." Other factors, such as reliability and speed, have to be considered.

[B]rokers have not been held ... to an absolute requirement of achieving the most favorable price on each order[.] [W]hat has been required is that the broker endeavor, using due diligence, to obtain the best execution possible given all the facts and circumstances. These factors include, among other things, the size of the order, the trading characteristics of the security involved, the availability of accurate information affecting choices as to the most favorable market in which execution might be sought, the availability of technological aids to process such data, the availability of economic access to the various market centers and the costs and difficulty associated with achieving an execution in a particular market center.

*Second Report on Bank Securities Activities: Comparative Regulatory Framework Regarding Brokerage–Type Services* 97–98, n. 233 (Feb 3, 1977), *as reprinted in* H.R.Rep. No. 145, 95th Cong., 1st Sess. 2333. It may well be that in any given transaction inquiry of all relevant markets and pending orders might produce a price superior to the NBBO price, but it may not constitute best execution in that transaction because of delay and it may not constitute best execution generally because were the practice followed in all transactions the interests of all customers in an inexpensive and efficient market might be impaired.

As noted above, none of the sources cited by the parties in support of their respective interpretations of the prevailing standard for the duty of best execution reveals a rule, regulation or interpretation of a regulation which directly addresses the question of whether exclusive reference to the NBBO satisfies that duty. Defendants' narrow interpretation of such terms as "interdealer market" and "best current displayed bid or offer" affords them the opportunity to infer support from sources that do not in fact limit broker/dealers' duty to an obligation to refer only to the interdealer market or quotation display represented by the NASDAQ system. Plaintiffs, on the other hand, offer only broad statements concerning the duty of broker/dealers to obtain best execution that make no mention of the NBBO.

Attempts to rely on industry custom to clarify the prevailing standard for duty of best execution during the class period are similarly of no avail. The affidavits supplied by the parties on market practices predictably contradict each other in conclusory terms that rely solely on the authority of their authors. Declarations of T. Grant Callery, David S. Ruder, Richard Y. Roberts and Junius W. Peake. On balance they provide little guidance. The affidavit of a former OTC trader who attested to his regular use of sources other than the NBBO also failed to shed any light on industry custom during the class period because it described only conduct that preceded the class period. Declaration of Paul M. Lacy, ¶ 2.

Thus it is an undisputed fact that highly qualified, totally responsible participants in the securities market have differing opinions about the best way to execute OTC orders. The regulatory agencies which are experts in the field are seeking the best approach which will serve the immediate interests of customers and the long-run interests of customers and other market participants in an effective securities market.

Moreover, it is unclear that demonstrating industry custom would be determinative: SEC and judicial rulings concerning failure to exercise reasonable diligence to obtain best execution or to provide sufficient disclo-

sure in the absence of obtaining best execution have been limited to cases in which there have been express representations contrary to existing regulations or SEC interpretations thereof. *Charles Hughes & Co. v. SEC,* 139 F.2d 434 (2d Cir.1943), *cert. denied,* 321 U.S. 786, 64 S.Ct. 781, 88 L.Ed. 1077 (1944) (broker-dealer's license revoked as a result of willful violations of Securities Act of 1934); *Opper* (broker made explicit representations that he was attempting to execute plaintiff's orders when in fact he was trading on his own behalf in the same security); *Barnett v. United States,* 319 F.2d 340 (8th Cir.1963) (Violation of securities antifraud provisions found where firm, after expressly accepting customer's order to sell, traded on its own behalf in same security without executing customer's order).[11]

Plaintiffs here have made no allegations that any express representation was made in any of the subject transactions. No special circumstances are shown. Rule 10b–5 makes it unlawful "[t]o make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, *in the light of the circumstances under which they were made,* not misleading." 17 C.F.R. § 240.10b–5(b) (emphasis added). "[W]hat has been required is that the broker endeavor, using due diligence, to obtain the best execution possible *given all the facts and circumstances.*" *Payment For Order Flow,* Exchange Act Release No. 33206 [1993 Transfer Binder] Fed.Sec. L.Rep. (CCH) ¶ 85,234, 84,536 at 84,541 (emphasis added). Even if plaintiffs, as class representatives, were to show some special circumstances, pursuit of the class action would be prohibitively unwieldy, requiring investigation into each and every covered transaction to determine what special circum-

stances, if any, were sufficiently similar to those alleged in the complaint to warrant inclusion in the class.

Furthermore, the implied representations, a promise of "fair dealing," specifically, to obtain best execution, are built on shifting sands: no one is sure quite what best execution means in all circumstances. It may be that best execution was not in fact satisfied in the subject transactions by exclusive reference to the NBBO, but it would be highly imprudent to hold defendants liable for making a material omission of fact by means of an implied representation based on a ill-defined duty that the relevant regulatory agency is only now struggling to clarify for an industry that is constantly undergoing technological change.

*Scienter*

Even if defendants, in holding themselves out as broker/dealers who would charge their customers "fair" prices, made an implied representation that "omitted" a material fact, that is, that there might be prices better than the NBBO available, a jury could not reasonably find that there was an intent to deceive or an "extreme departure from the standards of ordinary care" sufficient to constitute the requisite scienter for a claim of fraud. Knowledge of omitted facts on its own does not establish scienter. *SEC v. Southwest Coal & Energy Co.,* 624 F.2d 1312, 1321 n. 17 (5th 1980) ("[K]nowledge of the fraud, and not merely the undisclosed facts, is indispensable ..." to proving securities fraud. *Quoting Hirsch v. duPont,* 553 F.2d 750, 759 (2d Cir.1977)). There must be an intent to deceive, *Ernst,* 425 U.S. at 197 and 199, 96 S.Ct. at 1382–83 and 1383–84; *SEC v. Texas Gulf Sulphur Co.,* 401 F.2d 833, 868 (2d Cir.1968) (Friendly, J.) ("[I]mposition of

---

**11.** Plaintiffs cite *Chasins v. Smith, Barney & Co.,* 438 F.2d 1167 (2d Cir.1970) for the proposition that even if it were industry custom to execute exclusively at the NBBO, defendants could not use such industry wide practice as a shield against an allegation of misrepresentation because "[E]ven where a defendant is successful in showing that it has followed a customary course in the industry, the first litigation of such a practice is a proper occasion for its outlawry if it is in fact in violation." Two factors differentiate this case from the present one: 1) The court in *Chasins* was clear to limit its decision to "the

particular circumstances proved in this case." *Chasins,* 438 F.2d at 1172. "We do not attempt to address ourselves to the question of [the relevant industry policy]." *Id.* 2) The circumstances surrounding the parties' interaction in *Chasins* were established in great detail and the omission, a failure to inform the customer of the broker/dealer's market maker status, was placed in this context of express representations. Plaintiffs' allegations here are premised on solely on the general nature of the relationship between the parties and make no effort to particularize any misrepresentations.

liability for damages under Rule 10b–5(2), absent a *scienter* requirement ... would [ ] go beyond the authority vested in the Commission by § 10(b) to act against 'any manipulative or deceptive device or contrivance' and be so inconsistent with the general structure of the statutes as to be impermissible ..."); or a reckless omission of material facts, *Coleco Industries, Inc. v. Berman,* 567 F.2d 569 (3d Cir.1977) (per curiam), *cert. denied,* 439 U.S. 830, 99 S.Ct. 106, 58 L.Ed.2d 124 (1978) (scienter element in a § 10(b) case requires "a conscious deception or ... a misrepresentation so recklessly made that the culpability attaching to such reckless conduct closely approaches that which attaches to conscious deception."); *McLean* at 1197 n. 12; *see also Sundstrand Corp.,* 553 F.2d at 1044–45; *Shivangi,* 825 F.2d at 889; *and Franke v. Midwestern Oklahoma Development Authority,* 428 F.Supp. 719, 725 (W.D.Okl.1976) ("[R]eckless conduct may be defined as a highly unreasonable omission, involving ... an extreme departure from the standards of ordinary care ...").

It is undisputed that defendants' reliance on NBBO prices when executing small orders is widely, if not almost universally followed with respect to OTC securities. That this is the practice is fully known in the industry. It is no secret. The issue before the regulatory agencies is whether the practice should be modified and, if so, how.

The absence of contemporaneous SEC or NASD guidance on the validity of exclusive reference to the NBBO makes formation of an intent to deceive as to the sufficiency of such conduct a contradiction of terms. Broker/dealers are obliged by statute to adhere to SEC and NASD regulations. Where there is no regulation in place, it might reasonably be argued that there could be commission of an act which later, after promulgation of relevant rules, could be said to have been unfair, but it cannot be maintained that an intent to deceive as to a prevailing standard could exist when the standard was, at the time, as yet undetermined by the relevant authorities. *Christidis v. First Pennsylvania Mortg. Trust,* 717 F.2d 96, 100 (3d Cir.1983) (dismissal for lack of scienter in

securities fraud action brought under Section 10(b) was based on Rule 9(b) defect of failure to show that "defendants knowingly departed from reasonable [industry] practices."). The alternative contention that there might be liability for reckless departure from an ordinary standard of care when the current standard of care was at best ambiguous is similarly untenable: one cannot recklessly disregard that which is not discernible. *See Platsis v. E.F. Hutton & Co.,* 946 F.2d 38, 41 (6th Cir.1991) ("Since very few brokers disclosed [the alleged material fact] at the time the[ ] events took place and there was no established regulatory duty to disclose these items, an intent to deceive or an 'extreme departure from the standards of ordinary care' could not be established merely by the omission of this information in the absence of special circumstances.")

*Scope of Judicial Scrutiny*

In a modern market that involves both rapid evolution of technology and large-scale expansion of the use of that technology, a state of constant and sometimes radical change may, in one sense, represent the "status quo." For the past twenty years the world of the stock exchange floor, the ticker tape and face-to-face trading, while still an active part of the securities business, has steadily been giving way to the world of quotation display screens and on-line transactions. Much of the trading that only recently took place on a handful of national exchanges now occurs on large, decentralized networks of electronically linked offices throughout the world. The constant challenge presented by technological improvements, new investment vehicles and the rise of new trading methods in this evolving environment makes the need for a governmental agency dedicated exclusively to monitoring and regulating its smooth functioning all the more evident.

Congress has established the manner in which rules governing the OTC market should be devised. NASDAQ is an indirect subsidiary of the NASD. The NASD is a self-regulatory organization that is empowered by statute to operate the NASDAQ system and to promulgate and enforce rules of conduct for all firms that act as securities

brokers or dealers. Under the Securities Exchange Act of 1934, all brokers and dealers must be NASD members, and are subject to the rules and standards imposed by the NASD. 15 U.S.C. § 78o(b)(8). The SEC must review and approve any NASD rule before the rule becomes effective. 15 U.S.C. § 78s. The NASD and SEC are the agencies to which Congress has assigned these comprehensive and delicate tasks, which require a depth of expertise and familiarity with the markets.

"The SEC [was] invested [by Congress] with broad discretionary powers equal to the complex and changing nature of the problems arising in the securities industry." *Gordon v. New York Stock Exchange, Inc.,* 498 F.2d 1303, 1306 (2d Cir.1974), aff'd 422 U.S. 659, 95 S.Ct. 2598, 45 L.Ed.2d 463 (1975) (cf. H.R.Rep No. 1383 at 6–7, 73d Cong, 2d Sess (1934)). It is inappropriate for courts to interfere with that mandate except under extraordinary circumstances. "[T]he expertise of [the agency] is far greater than that possessed by the courts ... at least with respect to the economic complexities and technicalities inherent in [the regulated industry]." *Movers' & Warehousemen's Ass'n of Amer. v. United States,* 303 F.Supp. 563 (D.N.J.1969). The Supreme Court has said "[The function of an agency] is not only to appraise the facts and to draw inferences from them but also to bring to bear upon the problem an expert judgment and to determine from its analysis of the total situation on which side of the controversy the public interest lies." *United States et al. v. Detroit & Cleveland Navigation Co. et al.,* 326 U.S. 236, 241, 66 S.Ct. 75, 77, 90 L.Ed. 38 (1945).

The issues which plaintiffs raise have been and are being specifically addressed by the SEC and the NASD. The rules recently proposed by the SEC contemplate the inclusion of any quotes posted on any alternative sources in the required best bid/ask quotation that broker/dealers are required to post on NASDAQ Levels 2 and 3.

The proposed amendments ... are intended to improve the quality and expand the scope of published quotation information from OTC market makers and special-

ists by requiring them to reflect in their public quotes the bid and offer prices (*e.g.,* priced orders) they disseminate through electronic communications networks that provide the ability to execute against these priced orders.

*Order Execution Obligations* at 21–22. Thus the NBBO, the composite best bid and offer as derived from all market makers posted quotes, would, if the proposals are adopted, reflect not just the best prices available on the NASDAQ Level 2, but the best prices available from *all* sources, including Select-Net and Instinet. In choosing to remedy the problem of the "splintering" of quotation information, whereby "OTC market makers and specialists publish[ ] different proposed trading prices in different quotation systems, some with limited access," *id.* at 20, by "expanding" the NBBO rather than clarifying the nature of the broker/dealers' obligation to maintain parity with the NBBO, the SEC has considered all the relevant commercial, technical, and legal factors, applied its expertise and devised a regulatory scheme that best protects the public interest. NAqcess, the proposed replacement for the SOES system that would allow interaction between retail limit orders and market orders is a similarly carefully considered solution, designed to accommodate the various and sometimes conflicting interests of professional traders, their customers and the general public.

It should be noted that the solutions proposed by the regulatory agencies eliminate difficulties that would be inherent in the procedures which plaintiffs contend defendants should have followed. Broker/dealers could in the usual situation still refer to a single quotation system, the NBBO, modified to reflect additional data. They would not have to delay execution of orders by referring to multiple quotation systems, some of which might not be available to all broker/dealers. It should also be noted that the proposed regulations are prospective only.

Thus, without commenting on the sufficiency of exclusive reference to the NBBO to satisfy the duty of best execution, the SEC has, in its wisdom, determined that it is in the interest of maintaining fair and orderly

markets and assuring "the practicability of brokers executing investors' orders in the best market," 15 U.S.C. § 78k–1(a)(1)(C)(iv), that the NBBO should reflect the full range of interdealer quotes and that some retail limit and market orders should be crossed. Such a pronouncement indicates that the appropriate regulatory agency, in its capacity as the governmental body charged with maintaining expertise on the current condition of the securities markets and overseeing their fair and efficient operation, has studied the problem of ensuring best execution of retail customers' orders, has taken into consideration the state of the technology and the proliferation of alternative sources of liquidity, has weighed the competing interests of cost of compliance and public confidence and has fashioned a solution that takes into account all the relevant factors.

These regulatory developments confirm that defendants cannot have misrepresented material facts by following existing practices and that defendants cannot have acted with scienter when only now the regulatory agencies are exploring and adopting regulations designed to meet a continually evolving market.

It would not be appropriate for a court or a jury to inject itself into this carefully considered determination. The court has not been asked to prospectively enjoin the defendants, to review administrative regulations for arbitrary and capricious use of regulatory discretion or to compel the SEC to fulfill its statutory mandate. Plaintiffs are effectively asking the court to retroactively second-guess the SEC. While the comprehensive scheme devised by Congress to regulate the securities industry may itself be ripe for reform [12], the judiciary should not be used as a method to bypass that scheme. In light of all the foregoing, summary judgment must be granted in favor of defendants on plaintiffs' federal claims.

*State Law Claims*

Count II of the Amended Complaint alleges breach of fiduciary duty under state law. Count III alleges unjust enrichment under state law. Insufficiency of a claim under federal securities laws does not necessarily preclude liability under state common law, *Santa Fe Industries, Inc. v. Green,* 430 U.S. 462, 479, 97 S.Ct. 1292, 1304, 51 L.Ed.2d 480 (1977); *Gochnauer,* 810 F.2d at 1050. However, district courts may decline to exercise supplemental jurisdiction over a pendant state claim "if the district court has dismissed all claims over which it has original jurisdiction." 28 U.S.C. § 1367(c)(3); *United Mine Workers v. Gibbs,* 383 U.S. 715, 726 (1966) ("If the federal claims are dismissed before trial, even though not insubstantial in a jurisdictional sense, the state claims should be dismissed as well"); *Tully v. Mott Supermarkets, Inc.,* 540 F.2d 187, 196 (3d Cir.1976) (Dismissal of pendant state law claims in a securities fraud action brought under Section 10(b): "If it appears that the federal claim is subject to dismissal ... or could be disposed of on a motion for summary judgment under F.R.Civ.P. 56, then the court should ordinarily refrain from exercising jurisdiction ..."). Accordingly, plaintiffs' state law claims will be dismissed without prejudice.

## CONCLUSION

For the reasons stated above, the motion of defendants for summary judgment on plaintiffs' federal claims is granted. Plaintiffs' state law claims will be dismissed without prejudice.

12. In response to criticism that the NASD has failed to keep pace with the growth and evolution of the NASDAQ market, the NASD recently accepted the recommendation of an advisory committee, chaired by former Senator Warren B. Rudman, to implement a major structural reorganization, breaking the NASD into three independent bodies, in charge of policymaking, regulation of broker/dealers and operation of NASDAQ respectively with each entity governed by mixed boards of industry and non-industry representatives. *Executive Summary of the Report of the NASD Select Committee on Structure and Governance to the NASD Board of Governors* at 21–22.