UNITED STATES of America, Plaintiff,

v.

Nicholas A. RUDI, Defendant.

No. 95 Cr. 166 (LLS).

United States District Court,
S.D. New York.

Oct. 24, 1995.

United States Attorney, Southern District of New York, New York City, for United States; Jonathan Rosenberg, Kenneth J. Vianale, of counsel.

Thomas P. Puccio, New York City, for defendant.

Securities and Exchange Commission, Washington, DC, for Amicus Curiae, in Opposition to Defendant's Motion to Dismiss Indictment; Simon M. Lorne, General Counsel, Paul Gonson, Solicitor, Jacob H. Stillman, Associate General Counsel, Susan S. McDonald, Senior Litigation Counsel, Catherine A. Broderick, Counsel to the Assistant, General Counsel, of counsel.

## OPINION AND ORDER

STANTON, District Judge.

Defendant Nicholas Rudi moves to dismiss an indictment charging him with securities fraud, mail fraud, extortion, and aiding and abetting recordkeeping violations arising out of his solicitation, receipt and concealment of a kickback while acting as independent financial advisor to the Camden County Municipal Utilities Authority ("the CCMUA").

### ALLEGATIONS

The indictment alleges the following as facts.

Rudi founded Consolidated Financial Management ("CFM") and served as its president during the relevant time period. (Indictment ¶ 1.) CFM provided financial advisory services to local governments and governmental authorities in New Jersey which sought to issue municipal bonds. (Id. ¶ 2.) It held itself out as an independent advisor dedicated to obtaining for an issuer "the lowest rate feasible, together with the lowest issuance cost obtainable." (Id. ¶ 7.)

The CCMUA, a wastewater treatment authority formed by Camden County, New Jersey, contracted with CFM for financial advisory services. Until 1989, CFM's fee from the CCMUA was $1.00 per $1,000 principal amount of bonds issued by CCMUA plus expenses. The parties called the arrangement "a buck-a-bond." (Id. ¶ 6.) In 1989 and 1990, however, the CCMUA board of commissioners limited CFM's fees to $15,000, eliminating the "buck-a-bond" fee structure. (Id. ¶ 7.)

In late 1988, First Fidelity Bank, N.A. ("First Fidelity"), which had underwritten bonds issued by the CCMUA in 1987, began discussing with CFM the possibility of refunding those bonds in order to take advantage of lower interest rates. Rudi "communicated to representatives of potential underwriters, in substance, that he was the Authority, and that he would decide which investment banks would be included as underwriters in any such refunding transaction." (Id. ¶ 14.)

In early 1990, the CCMUA issued approximately $237.5 million in bonds in two series (the "1990 Bonds"), the proceeds from which were used to pay, among other things, principal and interest on bonds issued by the CCMUA in 1987. CFM served as the CCMUA's financial advisor on the 1990 Bond deal and Rudi assisted in the preparation of the official statement, selected First Fidelity as the lead underwriter, and negotiated the gross underwriting spread [1] with First Fidelity. The CCMUA paid CFM $15,000 plus expenses for those services. (Id. ¶ 16.)

In late 1989, Rudi told George Tuttle, a vice president of First Fidelity, that the CCMUA was willing to pay CFM only $15,000 in connection with the 1990 Bond deal, and that Rudi wanted First Fidelity to make up the difference between the $15,000 fee and the amount CFM would have received under the "buck-a-bond" arrangement. Tuttle agreed to make the payment. (Id. ¶ 21(a).)

In January 1990, Tuttle told Rudi that the underwriting syndicate's spread on the 1990 Bond deal was $19.50 per $1,000 principal amount. The $19.50 included a structuring fee to which Tuttle added $1 per bond (i.e., $237,000) to fund the payment to Rudi. Contrary to his usual practice, Rudi did not negotiate to reduce the spread, because the

---

1. The underwriting spread is the difference between the price paid to the issuer by the underwriters and the initial public offering price. The spread is composed of the underwriters' compensation and the selling concession, which are determined by the underwriting syndicate (the group of underwriters) in light of the offering's characteristics. Exchange Act Release No. 15807 (May 9, 1979), [1979 Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 82,073, at 81,757–58.

larger spread allowed First Fidelity to make the additional payment. (*Id.* ¶ 21(b).)

Rudi, his CFM partner Joseph Salema, Tuttle, and the principal of Meadowlands Securities, Inc. ("Meadowlands"), a corporation which helped First Fidelity to obtain underwriting engagements, agreed that First Fidelity would not send the payment directly to CFM. Instead, First Fidelity would send the money to Meadowlands, disguising it as part of Meadowlands' finder's fee for the 1990 Bond deal. Then, Meadowlands would send the money to Armacon Investment Company ("Armacon"), of which Salema was president. Finally, Salema would transfer the payment from Armacon to CFM. (*Id.* ¶ 21(c).)

From about December 1989 through December 1990, First Fidelity sent Meadowlands checks in a total amount of approximately $595,000, which were falsely recorded on First Fidelity's books as a finder's fee. The Meadowlands principal made three checks totalling $335,000 payable to Armacon and gave them to Salema. Salema then wrote six Armacon checks to CFM. (*Id.* ¶ 21(d).)

Even after Tuttle forwarded the $595,000 payment to Meadowlands, he erroneously believed that First Fidelity still owed CFM $22,000. (*Id.* ¶ 21(e).) Rudi sent First Fidelity a $22,000 invoice for consulting services supposedly (but not actually) performed by CFM on another securities transaction. First Fidelity paid the invoice at Tuttle's behest. (*Id.* ¶ 21(f).)

In February 1990, Rudi certified to the CCMUA that the $15,300 fee and expenses paid by the CCMUA to CFM for services related to the 1990 Bond deal was "fair and reasonable, and that no bonus has been given or received, or promised to or by anyone to the knowledge of the deponent in connection therewith." (*Id.* ¶ 21(g).)

*DISCUSSION*

Rudi argues that (1) the indictment should be dismissed because prosecutors misled the grand jury about the contractual relationship between CFM and the CCMUA; (2) count one fails to allege a violation of section 10(b) of the Securities and Exchange Act of 1934,

15 U.S.C. § 78a *et seq.* (the " '34 Act") and Rule 10b–5; (3) count two, which charges Rudi with extortion, should be dismissed because Rudi is not a government employee; (4) counts four and five fail to allege that Rudi aided and abetted record-keeping violations; and (5) venue for counts four and five is not proper in the Southern District of New York.

## I. PROSECUTORIAL MISCONDUCT

Paragraphs six and seven of the indictment state:

6. In or about February 1985, the CCMUA entered into a professional services contract with CFM, which was renewed annually on terms that varied from year-to-year. At all times relevant to this Indictment, the CCMUA hired CFM to be, among other things, its financial advisor on the CCMUA's issuances of securities. Until 1989, CFM's financial advisory fee from the CCMUA was $1.00 per $1,000 of the principal amount of the securities issued by the CCMUA, plus expenses. Thus, for example, if on a given deal, the CCMUA issued $100 million of securities, it would pay CFM a financial advisory fee for that deal of $100,000, plus expenses. The parties often referred to this fee as "a buck-a-bond."

7. On or about February 14, 1989, the CCMUA board of commissioners adopted a resolution authorizing CFM to continue to perform professional services for the CCMUA, but limiting CFM's fees for 1989 to $15,000. The CCMUA imposed this same $15,000 fee limitation on CFM for 1990. Thus, for the years 1989 and 1990, the CCMUA eliminated the lucrative "buck-a-bond" fee arrangement, and substituted a flat fee of $15,000 per year. The board of commissioners reinstated the "buck-a-bond" fee in February 1991 for the year 1991.

■ Rudi asserts that the CCMUA contracts with CFM for 1989 and 1990 excluded services relating to the issuance of debt, which were the services for which Rudi allegedly received the kickback. According to Rudi, paragraphs six and seven of the indictment demonstrate that the government in-

tentionally misled the grand jury into thinking that the fee limitation applied to bond work in order to establish the "erroneous fee arrangement" which Rudi argues is the predicate for all the charges in the indictment.

The argument misses the thrust of the indictment. Rudi's alleged loss of the "buck-a-bond" fee is background, and may supply motivation. The crime is the secret kickback from First Fidelity and the false denial of its receipt.

Thus, the claimed error or omission in the government's explanation of that fee arrangement did not "substantially influence[ ] the grand jury's decision to indict" or raise " 'grave doubt' that the decision to indict was free from the substantial influence" of the inaccurate presentation. *Bank of Nova Scotia v. United States,* 487 U.S. 250, 256, 108 S.Ct. 2369, 2374, 101 L.Ed.2d 228 (1988).

Rudi's motion for inspection of the grand jury minutes and dismissal of the indictment is denied.

## II. SECTION 10(b)

Rudi argues that count one of the indictment should be dismissed because (1) his alleged failure to disclose the kickback is not prohibited by the federal securities laws; (2) the sale of bonds from CCMUA to First Fidelity is not a sale within the meaning of section 10(b); (3) no use of interstate commerce, the mails or a national securities exchange is alleged; and (4) the additional $22,000 payment was not material to any investment decision and thus cannot support section 10(b) liability.

### A. Scope of Section 10(b)

Section 10(b) of the '34 Act forbids any person to use, "in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe. . . ." 15 U.S.C. § 78j(b). Rule 10b–5 prohibits any fraudulent scheme, false statement or misleading omission, or any act or practice which "operates or would operate as a fraud or deceit upon any person." 17 C.F.R. § 240.10b–5.

■ Section 10(b) and Rule 10b–5 " 'prohibit *all* fraudulent schemes in connection with the purchase or sale of securities, whether the artifices employed involve a garden type variety of fraud, or present a unique form of deception.' " *Superintendent of Insurance v. Bankers Life and Casualty,* 404 U.S. 6, 11 n. 7, 92 S.Ct. 165, 168 n. 7, 30 L.Ed.2d 128 (1971) (quoting *A.T. Brod & Co. v. Perlow,* 375 F.2d 393 (2nd Cir.1967)).

■ Rudi argues that his failure to disclose the compensation paid to him by First Fidelity was not done "in connection with" the 1990 Bonds and thus is not covered by section 10(b) and Rule 10b–5. He relies on the Second Circuit's statement in *Chemical Bank v. Arthur Andersen & Co.,* 726 F.2d 930, 943 (2nd Cir.1984), that to establish the required nexus between the deception and the sale, "it is not sufficient to allege that a defendant has committed a proscribed act in a transaction of which the pledge of a security is a part."

In *Chemical Bank,* banks loaned money to a borrower in reliance on statements by the borrower's accountant regarding the borrower's financial strength. The loan was collateralized by a pledge of stock owned by the borrower. The court upheld the dismissal of the banks' claim under section 10(b) because the banks did not allege any misrepresentation regarding the value of the stock, with respect to which "the banks got exactly what they expected." *Id.*

The *Chemical Bank* court dismissed the section 10(b) claim because the alleged misrepresentation did not go to the value of the stock or the nature of the consideration: "The purpose of § 10(b) and Rule 10b–5 is to protect persons who are deceived in securities transactions—to make sure that buyers of securities get what they think they are getting and that sellers of securities are not tricked into parting with something for a price known to the buyer to be inadequate or for a consideration known to the buyer not to be what it purports to be." *Id.*

Unlike *Chemical Bank,* Rudi's alleged fraud did involve the consideration paid for the 1990 Bonds. Had an amount allocated for Rudi's payment not been included in the underwriting spread, the spread would have

been smaller and the CCMUA would have received more from the bond offering. Rudi's actions thus tricked the CCMUA into parting with something for an inadequate price and a consideration which the buyer knew was not what it purported to be. *See also S.E.C. v. Drysdale*, 785 F.2d 38, 42 (2nd Cir.1986) (Accountant's misrepresentation actionable under section 10(b) because it "pertained to a significant part of the consideration offered by" co-defendant.); *Manufacturers Hanover Trust Co. v. Smith Barney, Harris Upham & Co.*, 770 F.Supp. 176, 180 (S.D.N.Y.1991) (Relevant inquiry is "whether defendants' alleged fraud deprived plaintiff of information that might have been useful to it in deciding whether to purchase or sell securities which it actually did purchase or sell.").

Rudi also relies on two cases in which the alleged misrepresentations did not involve the securities themselves. The first is *Trustees v. Amivest Corp.*, 733 F.Supp. 1180 (N.D.Ill.1990), in which pension funds alleged that their former investment manager had concealed commissions and fees received from mutual funds. The court dismissed plaintiffs' claim under section 10(b) because the alleged fraud induced plaintiffs to hire the defendant to buy and sell securities on their behalf but was not related to a decision to invest in any particular security. *Id.* at 1185. The second is *Manufacturers Hanover Trust Co.*, *supra*, in which a stock transfer agent sued its employee under section 10(b) for embezzling stock certificates. The court dismissed the claim, holding that the employee's "generalized misrepresentations" concerning his activities "would have implicated only [his employer's] decision to rely upon [him] as an employee" and not any decision to purchase or sell a security. *Manufacturers Hanover*, 770 F.Supp. at 182.

Here, by contrast, the indictment alleges that Rudi's fraud deceived the CCMUA and caused it to sell the 1990 Bonds for less than they would have brought but for the fraud: it occurred in connection with the sale of the bonds and is covered by section 10(b) of the '34 Act and Rule 10b–5.

**B. Definition of "Sale"**

■ Rudi contends that section 10(b) and Rule 10b–5 do not cover a sale from an issuer to its underwriter.[2] He argues that excluding such face-to-face transactions between parties who have a pre-existing relationship best carries out Congress's sole intention in enacting the '34 Act—protecting the investing public.

The statutory language does not support that contention. The '34 Act defines a "sale" broadly, including "any contract to sell or otherwise dispose of," 15 U.S.C. § 78c(a)(14), and defines a "security" to include a bond. *Id.* § 78c(a)(10). By its terms, then, the '34 Act excludes neither sales from the issuer to the underwriter nor pre-distribution sales.

The congressional purpose in enacting the '34 Act does not require exclusion of face-to-face dealings between an issuer and its underwriter. Protection of investors was important, but it was not the sole purpose of Congress, which also intended to "achieve a high standard of business ethics ... in every facet of the securities industry." *United States v. Naftalin*, 441 U.S. 768, 775, 99 S.Ct. 2077, 2082, 60 L.Ed.2d 624 (1979); *see also id.*, 441 U.S. at 776, 99 S.Ct. at 2083 ("Respondent's assertion that Congress' concern was limited to investors is thus manifestly inconsistent with the legislative history."). While Congress wanted to protect the integrity of the securities markets, section 10(b) is intended " 'to prevent inequitable and unfair practices and to insure fairness in securities transactions generally, whether conducted face-to-face, over the counter, or on exchanges....' " *Shapiro v. Merrill Lynch, Pierce, Fenner & Smith Inc.*, 353 F.Supp. 264, 276 (S.D.N.Y.1972) (citation omitted); *see also Superintendent of Insurance v. Bankers Life and Casualty Co.*, 404 U.S. 6, 10, 92 S.Ct. 165, 168, 30 L.Ed.2d 128 (1971) ("And the fact that the transaction is not conducted through a securities exchange or an organized over-the-counter market is irrelevant to the coverage of § 10(b).").

---

**2.** This was not a "best efforts" underwriting, but a "firm" underwriting in which the bonds were sold to the underwriter for resale to the public.

First Fidelity purchased the bonds from the CCMUA for their face value minus the "spread." (*See* note 1 above) (Indictment ¶ 18.)

458

■ Rudi argues that because his alleged fraud occurred before distribution of the bonds to the public, section 17(a)[3] of the Securities Act of 1933 (the " '33 Act") covers his conduct. He contends that the '33 and '34 Acts do not overlap, and that the express '33 Act remedy precludes one under section 10(b) of the '34 Act.

The Supreme Court, stating that the Acts overlap, has rejected similar arguments. *See Herman & MacLean v. Huddleston,* 459 U.S. 375, 382–83, 103 S.Ct. 683, 687–88, 74 L.Ed.2d 548 (1983) ("[W]e see no reason to carve out an exception to Section 10(b) for fraud occurring in a registration statement just because the same conduct may also be actionable under Section 11 ... [I]t is hardly a novel proposition that the Securities Exchange Act and the Securities Act 'prohibit some of the same conduct.' ") (citation omitted); *Naftalin,* 441 U.S. 768, 778, 99 S.Ct. 2077, 2084, 60 L.Ed.2d 624 (1979) ("Respondent is undoubtedly correct that the two Acts prohibit some of the same conduct. But '[t]he fact that there may well be some overlap is neither unusual nor unfortunate.' ") (citations omitted).[4]

Furthermore, section 10(b) of the '34 Act and section 17(a) of the '33 Act are not coextensive: section 17(a) protects only purchasers, while section 10(b) protects both purchasers and sellers. *Contrast* 15 U.S.C. § 77q(a) ("It shall be unlawful for any person in the offer or sale of any securities....") *with id.* § 78j(b) (It shall be unlawful for any person to "use or employ, in connection with the purchase or sale of any security ... any manipulative or deceptive device or contrivance....").

The CCMUA's sale of the 1990 Bonds to First Fidelity was a sale within the meaning of the '34 Act.

3. Section 17(a) provides: "It shall be unlawful for any person in the offer or sale of any securities ... to employ any device, scheme or artifice to defraud, or ... to obtain money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements ... not misleading." 15 U.S.C. § 77q(a).

4. Rudi cites *Blue Chip Stamps v. Manor Drug Stores,* 421 U.S. 723, 752, 95 S.Ct. 1917, 1933, 44 L.Ed.2d 539 (1975), in which the Court stated

## C. Use of Interstate Instrumentalities

■ Rudi argues that the indictment fails to allege that he used any "means or instrumentality of interstate commerce or the mails, or of any facility of any national securities exchange" in connection with the alleged fraud. That argument is meritless.

An indictment " 'need do little more than to track the language of the statute charged and state the time and place (in approximate terms) of the alleged crime.' " *United States v. Stavroulakis,* 952 F.2d 686, 693 (2nd Cir.) (quoting *United States v. Tramunti,* 513 F.2d 1087, 1113 (2nd Cir.), *cert. denied,* 423 U.S. 832, 96 S.Ct. 54, 46 L.Ed.2d 50 (1975)), *cert. denied,* 504 U.S. 926, 112 S.Ct. 1982, 118 L.Ed.2d 580 (1992).

The indictment alleges:

From in or about December 1989, through in or about May 1990, in the Southern District of New York and elsewhere, NICHOLAS A. RUDI, the defendant, unlawfully, wilfully and knowingly, by use of means and instrumentalities of interstate commerce and the United States mails, directly and indirectly did use and employ manipulative and deceptive devices and contrivances in connection with the purchase and sale of securities, namely, the CCMUA's sale and the underwriters' purchase of the 1990 CCMUA Bonds....

(Indictment ¶ 19.)

To be liable under section 10(b), a person must use "any means or instrumentality of interstate commerce or of the mails." 15 U.S.C. § 78j. The indictment tracks the statutory language and sufficiently alleges that Rudi used an interstate instrumentality.

that the '34 Act is chiefly concerned with the regulation of post-distribution trading on stock exchanges and securities trading markets, while the '33 Act is chiefly concerned with disclosure and fraud in connection with offerings of securities—primarily initial distributions of newly issued stock from corporate issuers. That statement, in light of its generality and the Court's later statements in *Naftalin* and *Huddleston,* does not preclude application of section 10(b) to sales to underwriters.

## D. The Later Payment

■ Rudi contends that his failure to disclose the additional $22,000 kickback he allegedly received in April or May 1990 cannot support liability under section 10(b) because it was not material to any investment decision. Because that payment (and failure to disclose) was made three months after the sale from the CCMUA to First Fidelity was completed, Rudi urges, the CCMUA could not have based its decision whether to sell on the alleged non-disclosure.

However, the indictment does not allege that the $22,000 payment, standing alone, supports liability under section 10(b). Tuttle made that payment after the sale of the 1990 Bonds because he believed Rudi was owed additional money on the original kickback. Thus, the timing of the additional payment does not require dismissal of the securities fraud count.

\*   \*   \*   \*   \*   \*

In sum, the indictment sufficiently alleges a violation of section 10(b) of the '34 Act and Rule 10b–5. Rudi's motion to dismiss count one is denied.

## III. HOBBS ACT EXTORTION

■ The Hobbs Act imposes liability on one who "obstructs, delays, or affects commerce or the movement of any article or commodity in commerce, by robbery or extortion or attempts or conspires to do so...." 18 U.S.C. § 1951(a). Extortion is "the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear, or under color of official right." Id. § 1951(b)(2). The indictment alleges that Rudi obtained the kickback from First Fidelity on the 1990 Bond deal under color of official right. (Indictment ¶ 25.)

Rudi argues that under Second Circuit law he cannot be liable for extortion "under color of official right" because he is not a government employee.

Rudi primarily relies on United States v. Tillem, 906 F.2d 814 (2nd Cir.1990), in which the government charged a restaurant consultant with extortion and with aiding and abetting extortion committed by city health de-

partment restaurant inspectors. The court reversed his conviction, stating "[The consultant's] Hobbs Act conviction cannot stand. He was not an official in the City Department of Health; thus, he cannot be convicted of extortion under color of official right." Id. at 822.

Although the court's sweeping language might preclude the prosecution of a private person on an official right theory, the facts of Tillem compel a narrower reading. There was evidence that certain of the city inspectors, who were co-defendants in the case, negotiated for receipt of money in exchange for favorable inspections regardless of whether the restaurants actually passed the inspections and solicited payment from restaurant owners even when inspection showed that there were no violations. Id. at 818. The inspectors usually received the money from restaurant owners with whom they had dealt; when the inspectors encountered a manager who did not know of the arrangement, they " 'hinted' that payment was necessary for them 'to try to do the best [they could] for [the restaurant.]" Id. at 819. There seems to have been no evidence that the consultant solicited any money; rather, he "made payments regularly to guarantee that his client's restaurants would pass inspection." Id. The consultant did not represent to the payors of the money that he had the authority to pass or fail a restaurant. Thus, he did not obtain money under color of his own official right.

A more recent Second Circuit decision supports a narrow reading of Tillem. In United States v. McDonough, 56 F.3d 381 (2nd Cir. 1995), a former chairman of a county democratic committee was convicted of extortion under color of official right. The court affirmed, stating, "In order for a jury to find a defendant guilty of extortion under color of official right, the government must prove beyond a reasonable doubt that the victims were motivated to make payments as a result of the defendant's control or influence over public officials and that the defendant was aware of this motivation." Id. at 388. The court also held that the evidence sufficed to support a conviction: "Based on this evidence, a rational juror could conclude that

[the victim] believed that [the defendant] was able to control or influence public officials in the Town of Brunswick, and that this belief, at least in part, motivated the [victim] to pay kickbacks." *Id.* at 389.

The indictment sufficiently alleges extortion under color of official right.

## IV. RECORDKEEPING VIOLATIONS

The indictment alleges that Rudi aided, abetted and caused First Fidelity to violate section 15B(c)(1) of the '34 Act, which prohibits a broker, dealer or municipal securities dealer from using the mails or any interstate instrumentality to violate any rule of the Municipal Securities Rulemaking Board ("MSRB"). MSRB Rule G–8 requires bank dealers and municipal securities dealers to make and keep certain records and accounts.

According to the indictment, First Fidelity violated Rule G–8 by omitting the kickback from its books and records, falsely attributing the payment to a fee owed to Meadowlands and falsely attributing the additional $22,000 payment to another transaction. (Indictment ¶ 29.)

### A. Sufficiency of the Indictment

Rudi argues that the indictment does not allege a violation of section 15B(c)(1) because the alleged interstate instrumentality—the mailing of the preliminary official statements and official statements concerning the 1990 Bond deal to investors in New York—was not used until after the sale of the bonds from the CCMUA to First Fidelity.

The indictment alleges that Rudi, "by use of means and instrumentalities of interstate commerce and the United States mails, did aid, abet and cause First Fidelity, a bank dealer, and its associated persons, to effect a transaction in municipal securities, to wit, the CCMUA's sale and the underwriter's purchase of the 1990 CCMUA Bonds, in contravention of MSRB Rule G–8...." (Indictment ¶ 31.) Because the indictment tracks the statutory language and alleges use of an interstate instrumentality, dismissal is inappropriate. *See supra* part II.C.

### B. Venue

Section 27 of the '34 Act provides, "Any criminal proceeding [under this chapter or the rules thereunder] may be brought in the district wherein any act or transaction constituting the violation occurred." 15 U.S.C. § 78aa. Rudi argues that counts four and five must be dismissed because the indictment does not allege that any falsified records were made or kept in New York or that Rudi aided and abetted such recordkeeping by acts in New York.

However, one of the transactions allegedly violating section 15B(c)(1) was First Fidelity's purchase of the 1990 Bonds in violation of MSRB Rule G–8, which the indictment alleges took place in this district. (*See* Indictment ¶ 18.) Although the government bears the burden of proving by a preponderance of the evidence that venue is proper as to each count, *United States v. Stephenson*, 895 F.2d 867, 874 (2nd Cir.1990), at this stage the indictment need only allege acts that create proper venue. *United States v. Korolkov*, 870 F.Supp. 60, 63 (S.D.N.Y.1994). Dismissal of the indictment is thus not warranted.

### CONCLUSION

The motion to dismiss the indictment is denied.