## SECURITIES AND EXCHANGE COMMISSION, Plaintiff,

v.

### Stanley J. FEMINELLA and David Granston, Defendants.

#### No. 96 Civ. 336 (AGS).

United States District Court, S.D. New York.

Nov. 21, 1996.

724

Leo F. Orenstein and Kathleen M. Hamm, Washington, DC, for Plaintiff.

Plotkin & Manak, L.L.P., New York City, for Defendant Feminella.

## OPINION and ORDER

SCHWARTZ, District Judge:

This Securities and Exchange Commission enforcement action is before the Court upon defendant Stanley J. Feminella's motion to dismiss, pursuant to Federal Rules of Civil Procedure 12(b)(6) and 9(b). Oral argument was held on this motion on September 27, 1996. For the reasons that follow, defendant's motion is denied.

### BACKGROUND

In its Complaint, the Securities and Exchange Commission (the "SEC" or "Commission") alleges that for a period of at least five years, Feminella, a stockbroker, engaged in a corrupt scheme though which he paid kickbacks to the Chief Financial Officer of Consumers Union ("CU") on CU's purchases of securities, in return for directing CU's investment transactions to him. CU purchased two types of securities: Government National Mortgage Association mortgage-backed securities ("Ginnie Maes") and "stripped" United States Government Treasury notes and bonds ("STRIPS").

The SEC further alleges that Feminella charged a 3% sales credit for routine and ordinary brokerage services, which, when added to the spreads charged by defendant's firm, caused CU to pay markups ranging from 3.54% to 4.73%. The SEC asserts that such markups exceed those customarily imposed by securities brokerage firms in transactions involving the same or similar securities for comparable dollar amounts. Feminella allegedly knew and did not disclose that the prices paid by CU and its pension fund on their purchases of Ginnie Maes and STRIPS bore no reasonable relationship to the prevailing market prices for those securities.

The SEC claims that such acts violated Section 17(a) of the Securities Act of 1933 (the "Securities Act), 15 U.S.C. § 77q(a), Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78j(b), and Rule 10b–5, 17 C.F.R. § 240.10b–5, thereunder. The SEC requests that the Court permanently enjoin Feminella from violations of these antifraud provisions, order Feminella to disgorge the portion of the excessive markups he charged CU and its pension fund as well as the compensation he received as a result of the fraudulent conduct alleged, plus prejudgment interest thereon, and order that Feminella pay a civil penalty pursuant to Section 20(d) of the Securities Act and Section 12(d)(3) of the Exchange Act.

### DISCUSSION

In ruling on a motion to dismiss pursuant to Rule 12(b)(6), "a court must construe in plaintiff's favor any well-pleaded factual allegations in the complaint.... Dismissal of the complaint is proper only where it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Allen v. West Point–Pepperell, Inc.,* 945 F.2d 40, 44 (2d Cir.1991).

Feminella moves to dismiss the Complaint on the grounds that (1) the two SEC Commissioners sitting at the time the Complaint was filed lacked authority to approve the enforcement action against Feminella because, at the time, a quorum of at least three Commissioners did not exist, (2) the Complaint fails to state a cause of action against Feminella under the antifraud provisions, and (3) the Complaint fails to allege fraud with particularity.

#### Validity of the Action

Feminella first argues that the SEC lacked authority to commence this action because a quorum of Commissioners did not

exist at the time the action was authorized. Therefore, defendant submits, the Complaint is a nullity and the action should be dismissed.

It is undisputed that at the time this action was commenced, only two SEC Commissioners were in office. Normally, the SEC is composed of five Commissioners, who are appointed by the President with the advice and consent of the Senate. No more than three Commissioners may be members of the same political party. *See* 15 U.S.C. § 78d.

On March 30, 1995, the three Commissioners then sitting adopted a quorum rule, which provides in pertinent part:

> A quorum of the Commission shall consist of three members, provided, however, that if the number of Commissioners in office is less than three, a quorum shall consist of the number in office.

60 Fed.Reg. 17201 (1995) (codified at 17 C.F.R. 200.41). This rule was adopted without notice to, or comment from, the public because the SEC considered it to be related solely to the "agency's organization, procedure or practice." *Establishment of Commission Quorum Requirement,* Exchange Act Release No. 35548 (March 30, 1995). From July 15, 1995 through February 13, 1996, the SEC operated with only two Commissioners, both of whom were Democrats. The Complaint in this action was filed on January 18, 1996; the two sitting Commissioners apparently voted to initiate the action in late December 1995 or early January 1996.

Feminella argues that the SEC's new rule permitting a quorum of less than three sitting Commissioners is a nullity because the Commission does not have the authority to promulgate a rule "that abrogate[s] the common law quorum requirement, in contravention of the will of Congress." Defendant's Mem. of L. at 13. Defendant further contends that even if the SEC had the authority to pass the rule, it is invalid because it was not promulgated in accordance with the Administrative Procedure Act ("APA").

The Exchange Act, which created the SEC, is silent as to how many Commissioners constitute a quorum. *See FTC v. Flotill Products, Inc.,* 389 U.S. 179, 181 n. 3, 88 S.Ct. 401, 403 n. 3, 19 L.Ed.2d 398 (1967). Prior to promulgation of the new quorum rule, the SEC's policy had been that three Commissioners constituted a quorum for doing business. *See* Public Utility Holding Company Act of 1935, Release No. 850, n. 1 (October 13, 1937).

Feminella argues that under the common law rule, as stated in *FTC v. Flotill Products Inc., supra,* a valid quorum for the SEC consists of three Commissioners. In *Flotill,* the Federal Trade Commission ("FTC"), by a vote of 2–1 of its sitting Commissioners, issued an administrative cease and desist order against the defendant. Like the SEC, the FTC is composed of five Commissioners, no more than three of whom may belong to the same political party. The Federal Trade Commission Act does not specify the number of Commissioners who constitute a quorum; however, the FTC had promulgated a rule providing that a majority of the members of the FTC, or three Commissioners, constituted a quorum. The Court of Appeals for the Ninth Circuit held that the cease and desist order was invalid, stating that "an order of the Commission must be supported by three members in order to constitute an enforceable order of the FTC. Two of five is too few." *Flotill,* 358 F.2d 224, 230 (9th Cir. 1966). The Court of Appeals reasoned that, absent statutory authority or instruction to the contrary, the FTC could act only on the concurrence of a majority of the full Commission. *See id.* at 228. The Supreme Court reversed, rejecting this rationale in favor of the "almost universally accepted common-law rule" that "in the absence of a contrary statutory provision, a majority of a quorum constituted of a simple majority of a collective body is empowered to act for the body." *Flotill,* 389 U.S. at 183, 88 S.Ct. at 404. Thus, "[w]here the enabling statute is silent on the question, the body is justified in adhering to that common-law rule." *Id.*

In short, the Supreme Court in *Flotill* held that a federal agency "is not inhibited from following the common-law rule" as a substitute for a statutory quorum provision where none exists. *Id.,* 389 U.S. at 185, 88 S.Ct. at 405. The court did not hold, however, that the common law rule must be followed exclu-

sively. Therefore, contrary to defendant's argument, *Flotill* does not *mandate* a quorum rule for the SEC or any other agency. Likewise, Congress' inaction following the *Flotill* decision does not signify an intent to hold the Commission to the common law quorum rule.

The question in this case is whether Congress, in creating a Commission of five members and not specifying a quorum rule, would have intended that any action taken by less than some number of Commissioners be a nullity. Defendant is asking this Court to declare that the filing of the Complaint against him, and, by extension, all of the actions taken by the SEC for a period of approximately seven months, was an invalid act due to the fact that there were three vacancies on the Commission. In order to determine whether such a declaration would comport with the will of Congress, the Court must go beyond *Flotill* and the common law and attempt to glean Congressional intent from the statutes at issue. *Cf. Assure Competitive Transp., Inc. v. United States*, 629 F.2d 467, 473 (7th Cir.1980), *cert. denied*, 449 U.S. 1124, 101 S.Ct. 941, 67 L.Ed.2d 110 (1981) (vacancy provision in the Interstate Commerce Act showed "that Congress intended those Commissioners in office, however many there are, to be 'the Commission' for all purposes. 'A majority of the Commission,' the phrase used in the quorum provision, accordingly must mean a majority of those Commissioners in office").

The SEC refers the Court to two statutory bases supporting its authority to adopt the quorum rule. First, the agency points to the general rulemaking authorization in Section 23(a)(1) of the Exchange Act, which provides that "[t]he Commission ... shall ... have power to make such rules and regulations as may be necessary or appropriate to implement the provisions of this chapter for which [it] is responsible or for the execution of the functions vested in [it] by this chapter...." 15 U.S.C. § 78w(a)(1). The Securities Act contains an almost identical provision, giving the Commission the authority to "make, amend, and rescind such rules and regulations as may be necessary to carry out the provisions of this subchapter...." 15 U.S.C. § 77s(a). However, these provisions are generally cited as authority to make substantive rules prohibiting certain acts under the statutes, not as authority to establish the agency's own internal procedures. *See, e.g., United States v. Chestman*, 947 F.2d 551, 556–57 (2d Cir.1991), *cert. denied*, 503 U.S. 1004, 112 S.Ct. 1759, 118 L.Ed.2d 422 (1992).

■ The second provision that the SEC points to provides a stronger basis in support of its authority to promulgate the new quorum rule. Section 4A of the Exchange Act grants the Commission the power to delegate, by published order or rule, "functions with respect to hearing, determining, ordering, certifying, reporting, or otherwise acting as to any work, business, or matter" to an individual Commissioner, a hearing examiner, an employee or an employee board. 15 U.S.C. § 78d–1. Only the function of rulemaking may not be delegated by the Commission. *See id.* Thus, the Commission is authorized under this section to delegate to a single Commissioner a decision concerning whether or not to commence an enforcement action.[1]

Defendant argues that Section 4(a) bears no significance on this question because there was no legally constituted Commission to delegate its authority at the time the Commissioners considered commencing this action. However, there were three Commissioners in office, a quorum under common law principles and former SEC policy, when the quorum rule was passed. *See* Tr. at 48. Moreover, the Court finds Section 4(a) of the Exchange Act to be relevant here in that it demonstrates that Congress envisioned circumstances under which the Commission would find it necessary to carry out its functions, other than rulemaking, on the authori-

---

**1.** Section 4(b) provides that the Commission retains a discretionary right to review the action of any division of the Commission or individual Commissioner, taken pursuant to a delegation under 4(a). At oral argument, counsel for defendant argued that there was no full Commission to review the delegated authority. Transcript dated September 27, 1996 ("Tr.") at 15. However, nothing prevented the Commission, once fully constituted, from reviewing the decision to file this action against Feminella, which it apparently has chosen not to do.

ty of fewer than three Commissioners. In adopting Section 4(a), Congress gave the SEC authority to do just that. That, in essence, is what occurred in this case; and without clear authority showing that Congress intended otherwise, this Court is loathe to declare null and void the actions of an administrative body.

Defendant also argues that the quorum rule is invalid because it was not promulgated in accordance with the APA's notice and comment provisions. Under Section 4 of the APA, before adopting a rule, a federal agency is required to publish notice of the proposed rule in the Federal Register. The notice must include "a statement of the time, place, and nature of public rule making proceedings," as well as "reference to the legal authority under which the rule is proposed." 5 U.S.C. § 553(b). Notice must be given at least 30 days before the rule's effective date. 5 U.S.C. § 553(d). After notice is given, the agency must "give interested persons an opportunity to participate in the rule making through submission of written data, views, or arguments...." 5 U.S.C. § 553(c). Section 4(b)(3)(A) specifically exempts from these requirements "interpretive rules, general statements of policy, or rules of agency organization, procedure, or practice." *Id.*

The SEC submits that its quorum rule is a procedural rule, which fits within the "rules of agency organization, procedure, or practice" exception to the APA's notice and comment provisions. Defendant, on the other hand, contends that the quorum rule is substantive and legislative "because it created new law (*i.e.,* it overturned the common-law quorum requirement set forth in the Supreme Court's *Flotill* decision), and created new rights (the right of the SEC to take action with less than a majority of a quorum, when for sixty years it was required to act with at least a quorum)." Defendant's Mem. of L. at 14.

Congress' purpose in enacting Section 4 was that the interested public be given an opportunity to participate, and the federal agency be fully informed, before any rules that have a substantial impact on the rights of persons who are subject to them are promulgated. *Pickus v. United States Parole*

*Board,* 507 F.2d 1107, 1112 (D.C.Cir.1974). It is well established that adherence to this congressional purpose counsels a construction of the "procedure" exemption "that excludes from its operation action which is likely to have considerable impact on ultimate agency decisions." *Id.* at 1114; *see also Neighborhood TV Co., Inc. v. FCC,* 742 F.2d 629, 637 (D.C.Cir.1984) ("in determining whether a rule is substantive, we must look at its effect on those interests ultimately at stake in the agency proceeding"); *Brown Express, Inc. v. United States,* 607 F.2d 695, 702 (5th Cir.1979) (proper inquiry is not whether the rule is "substantive" or "procedural", but whether it will have a "substantial impact" on the industry being regulated). Thus, in *Pickus,* where the court found that the Parole Board's rules, promulgated without notice or comment, were "likely to produce parole decisions different from those which alternatives would be likely to produce," the rules were not exempt from the APA's notice and comment requirements. *Id.,* 507 F.2d at 1114. "On the other hand," the *Pickus* court stated, "a regulation ..., which merely prescribes order and formality in the transaction of Board business, is clearly within the procedure and practice exemption." *Id.*

The Court finds that the SEC's quorum rule merely prescribes order and formality in the Commission's functioning and does not produce decisions that are substantively different from those that an alternative rule might produce. The quorum rule pertains to nothing more than the Commission's mode of conducting its business and is completely neutral so far as regulation of the securities industry is concerned. In other words, it has no effect whatsoever on the rules and standards applied to those whose conduct is subject to the agency's jurisdiction because it is not directed toward a determination of the rights or interests of affected parties. *See Batterton v. Marshall,* 648 F.2d 694, 702 n. 34 (D.C.Cir.1980). The incidental effect that the quorum rule had on Feminella personally does not suffice. If, on the other hand, the Commission promulgated a rule governing whether a particular markup was excessive or whether a kickback was paid "in connec-

tion with" a securities transaction, such a rule would have a substantial impact on the industry and would, therefore, be subject to the notice and comment requirements.

Accordingly, the Court finds that the SEC's decision to commence this enforcement action was a valid act of the Commission. Furthermore, the agency's promulgation of the quorum rule did not violate the notice and comment requirements of the APA because the rule governs agency procedure.

### The Anti–Fraud Provisions

■ Defendant argues that the Complaint fails to state a claim under the anti-fraud provisions of the Securities Act and the Exchange Act. The SEC asserts that Feminella violated Section 17(a) of the Securities Act, Section 10(b) of the Exchange Act and Rule 10b–5 thereunder. In order to state a claim of violation of these provisions, the Commission must allege the following elements: (1) a misrepresentation or an omission where there is a duty to speak, (2) of a material fact, (3) made with scienter, amounting at least to recklessness, (4) in the offer or sale, or in connection with the purchase or sale, of a security.[2] *SEC v. First Jersey Secs., Inc.,* 890 F.Supp. 1185, 1209 (S.D.N.Y.1995).

■ Defendant contends that the SEC's excessive markup claim must be dismissed because (1) the alleged markups were not excessive and (2) Feminella could not have had the requisite scienter, even if the markups were excessive, since no discernible regulatory standard existed regarding excessive markups from which he could have knowingly or recklessly departed. The Complaint alleges that:

14. By charging sales credits of 3 percent or more, when added to the spreads charged by his firm, Feminella caused CU and its pension fund to pay without justification markups that exceeded those customarily imposed by securities brokerage firms in transactions involving the same or similar securities for comparable dollar amounts. Feminella never disclosed to

CU or its pension fund either the amounts of the sales credits or the amounts of the markups charged, nor did he disclose that the prices paid by CU and its pension fund on their purchases of Ginnie Maes and STRIPS bore no reasonable relationship to the prevailing market prices for those securities.

15. Feminella knew or was reckless in not knowing that charging at least a 3 percent sales credit on these transactions, when added to the spreads charged by his firm's trading desks, would cause CU and its pension fund to pay excessive markups and to purchase securities at prices that bore no reasonable relationship to the prevailing market prices for the securities.

Compl. ¶¶ 14–15. The SEC further asserts that Feminella received at least $904,000, or 65%, of the $1,386,755 of sales credits paid by CU and its pension fund. *See* Compl. ¶ 13.

In urging the Court to find that the markups charged in this case were not excessive as a matter of law and that Feminella could not have known that they were excessive, defendant claims that throughout the 1980's, the SEC in its enforcement cases consistently utilized a 10% excessiveness threshold for markups on zero-coupon bonds such as STRIPS. Further, defendant states, no case has previously held that markups under 8% on debt securities violated Rule 10b–5, let alone markups as low as 3.5% or 4.7%.

In a 1987 release, the SEC stated that,

the Commission believes that as a general matter, common industry practice regarding mark-ups is to charge a mark-up over the prevailing inter-dealer market price of between ½% and 3½% (including minimum charges) for principal sales to customers of conventional or "straight" Treasuries, depending on maturity, order size and availability. In light of this evidence, the Commission concludes that mark-ups on government securities, like mark-ups on corporate and municipal debt securities, usually are smaller than those on equity securities.

2. Unlike a private litigant, the Commission need not show justifiable reliance upon the alleged misrepresentation, omission or fraudulent de-

vice, nor damages resulting therefrom. *See SEC v. Hasho,* 784 F.Supp. 1059, 1106, n. 11 (S.D.N.Y.1992).

*Zero–Coupon Securities,* Exchange Act Release No. 24368 (April 21, 1987) (the *"Zero–Coupon Release"*); *see also In the Matter of Edward J. Blumenfeld,* Exchange Act Rel. No. 16437 (December 19, 1979) (markups on municipal bonds are "generally lower than those of equity securities"). Defendant argues that the *Zero–Coupon Release* provided no practical guidance to broker-dealers concerning markups on zero-coupon bonds, nor to branch office salespeople at broker-dealers concerning whether and how they should monitor their firm's pricing decisions.

However, the Court finds that the questions as to whether (1) the alleged markups were excessive and (2) defendant acted with scienter, at least amounting to recklessness, are factual issues, not properly determined on a motion to dismiss. First, defendant has not shown that the SEC has consistently applied a 10% excessiveness threshold for markups on zero-coupon bonds such as STRIPS. The two cases cited by defendant in support of this proposition, *SEC v. MV Securities Inc.,* Litigation Rel. No. 10289 (February 21, 1984) and *In the Matter of Sutro & Co., Inc.,* Exchange Act Rel. No. 23663 (September 30, 1986), were settled cases in which the broker-dealer had in fact charged markups or markdowns exceeding 10%. Neither release cited indicates that the SEC was applying a 10% excessiveness threshold or that it deemed markups of less than 10% to be not excessive. Rather, while markups of more than 10% are deemed to be *per se* fraudulent in the sale of equity securities, the SEC stated in its *Zero–Coupon Release, supra,* that markups charged on government and other debt securities should be measurably lower than those charged on equity securities.

The legal standard for determining when a markup is excessive has long been whether, based on all of the facts and circumstances in a given case, the price charged was reasonably related to the prevailing market price. *See In the Matter of Sheldon, Reid, and Pattison,* Exch. Act Rel. No. 31,475 (Nov. 18, 1992, 52 SEC Dkt. 3826, 3862; *In the Matter of Duker & Duker,* 6 S.E.C. 386, 389 (1939). Thus, where a defendant "exacts unreasonable profits resulting from a price which bears no reasonable relation to the prevailing price" of the security, the anti-fraud provisions of the Securities Act and the Exchange Act are violated. *Duker & Duker, supra.*

Moreover, "[t]he reasonableness of the profit charged can be determined only on the basis of the individual facts of each case." *Id.* In making this determination, the finder of fact must assess various factors, including, but not limited to, industry practice regarding the range of appropriate markups on a particular security or similar type of security in comparable transactions, *see Sheldon,* 52 SEC Dkt. at 3861–62 (markups of no more than 4% on government securities was industry practice); *F.B. Horner & Assocs., Inc. v. SEC,* 994 F.2d 61, 63 (2d Cir.1993) (noting that an average markup on zero coupon collateralized mortgage obligation bonds was 1.8 to 2.9% for dealers providing similar services); the unit price of the security, *see In the Matter of Ross Secs., Inc.,* 40 S.E.C. 1064, 1066 (1962); and the nature of the services that the brokerage firm or its associated persons have provided to the customer, *see F.B. Horner & Assocs.,* 994 F.2d at 63.

In *Sheldon, supra,* the SEC held that a brokerage firm's policy of charging a 5 point markup on discounted Ginnie Mae's violated the antifraud provisions of the Securities Act and the Exchange Act because the policy "precluded pricing the [ ] securities based on the particular circumstances of the sale or the market for the securities." *Id.,* 52 SEC Dkt. at 3862. Commenting on expert testimony that industry practice was to charge maximum markups of 4% on government securities, the SEC stated that "even a four percent—or smaller—markup on government securities may be excessive." *Id.* at n. 99. Given the fact-specific nature of the inquiry, it is clear that there is no single, fixed definition of what constitutes an excessive markup for all transactions. Rather, the fact finder must determine whether, under all the circumstances of the transaction, the price charged for the security was reasonably related to the prevailing market price. This determination cannot reasonably be made upon a motion to dismiss.

With regard to scienter, in order to establish this element, the SEC will have to show that the defendant acted

with actual intent to deceive, manipulate, or defraud, or severe recklessness, which is limited to those highly unreasonable omissions or misrepresentations that involve not merely simple or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and that present a danger of misleading buyers or sellers which is either known to the defendant or is so obvious that the defendant must have been aware of it.

*Shivangi v. Dean Witter Reynolds, Inc.,* 825 F.2d 885, 889 (5th Cir.1987) (citations omitted). As noted above, the Complaint alleges that Feminella knew, or was reckless in not knowing, that CU and its pension fund were paying excessive markups and purchasing securities that bore no reasonable relationship to the prevailing market prices. In addition, Feminella allegedly profited from the charging of the markups.

The Second Circuit has stated that where the moving party's state of mind is in issue, it is usually inappropriate to resolve a claim by summary judgment, *Wakefield v. Northern Telecom, Inc.,* 813 F.2d 535, 540 (2d Cir. 1987), let alone by dismissal pursuant to Rule 12(b)(6).[3] Indeed, the cases primarily relied upon by defendant in arguing that the Complaint should be dismissed for failure to allege scienter, *Platsis v. E.F. Hutton & Co., Inc.,* 946 F.2d 38 (6th Cir.1991), *cert. denied,* 503 U.S. 984, 112 S.Ct. 1669, 118 L.Ed.2d 389 (1992), and *In re Merrill Lynch Secs. Litig.,* 911 F.Supp. 754 (D.N.J.1995), were decided upon a bench trial and a motion for summary judgment, respectively.

In *Platsis,* the plaintiff claimed that the defendants fraudulently led him to believe that they did not profit from transactions in which E.F. Hutton acted as principal, rather than as agent, and that defendants' failure to explain this to plaintiff was a material omission in the face of a duty to disclose, in violation of Rule 10b–5. The district court

made various factual findings, including that very few brokers disclosed production credits, spreads or markups in 1980, the markups and credits were reasonable, and the broker did not know the amount of the spreads that the plaintiff was charged. *Id.* 946 F.2d at 40–41. From such facts, the Sixth Circuit concluded that the defendants did not act with scienter:

> Since very few brokers disclosed these credits at the time these events took place and there was no established regulatory duty to disclose these items, an intent to deceive or an "extreme departure from the standards of ordinary care" could not be established merely by the omission of this information in the absence of special circumstances.

*Id.* at 41. *Platsis* differs from the instant action in that the Court has not made any such factual findings at this stage in the litigation, and there exists an established duty, allegedly violated, not to charge a price that bears no reasonable relation to the prevailing price of a given security.

*In re Merrill Lynch, supra,* is also distinguishable from this case. There, plaintiffs alleged that the defendants' practice of relying exclusively on the National Best Bid and Offer ("NBBO") price quotation in executing small orders for NASDAQ stocks violated their duty to execute plaintiffs' orders at the best available price. The district court granted summary judgment in favor of defendants, noting that

> [i]t is undisputed that defendants' reliance on NBBO prices when executing small orders is widely, if not almost universally followed with respect to OTC securities. That this is the practice is fully known in the industry. It is no secret. The issue before the regulatory agencies is whether the practice should be modified and, if so, how.

**3.** Defendant's reliance on this Court's decision in *In re 1993 Corning Securities Litigation,* 1996 WL 257603 (S.D.N.Y. May 15, 1996), is misplaced. In *Dow,* the Complaint was dismissed for failure to allege facts giving rise to a strong inference of fraudulent intent. The Court noted that plaintiffs had failed to plead scienter under either of the recognized approaches in the Second Circuit; that is, either (1) alleging facts establishing a motive to commit fraud and an opportunity to do so, or (2) alleging facts constituting circumstantial evidence of either reckless or conscious behavior. *See id.* at *5–8; see also San Leandro Emergency Med. Group Profit Sharing Plan v. Philip Morris Companies, Inc.,* 75 F.3d 801, 813 (2d Cir.1996). The Complaint in this action does not suffer from the same infirmities.

*Id.,* 911 F.Supp. at 772. Accordingly, the court found that "it cannot be maintained that an intent to deceive as to a prevailing standard could exist when the standard was, at the time, as yet undetermined by the relevant authorities." *Id.* However, in the instant action, the practice of charging markups ranging from 3.5% to 4.7% is not "widely, if not almost universally followed," nor is it open or "fully known in the industry." *Id.* In addition, while there is no fixed standard representing an appropriate markup for the transactions at issue, there is regulatory guidance as to what is acceptable, which bears repeating: the price charged must be reasonably related to the prevailing market price of the security. Whether defendant's profit was unreasonable and whether defendant intended to deceive his client or acted with severe recklessness, are questions of fact, not properly determined on a motion to dismiss the Complaint pursuant to Rule 12(b)(6).

Defendant further contends that his alleged failure to disclose the sales credits charged did not violate Rule 10b–5 because, during the time period in question, the SEC did not require broker-dealers to disclose sales credits. Defendant relies on *Platsis, supra,* in which the court found that the defendant was under no regulatory duty to disclose *non-excessive* sales credits, in the absence of special circumstances. *Id.,* 946 F.2d at 40–41. However, it is well established that failure to disclose an *excessive* markup constitutes a violation of Section 17(a) of the Securities Act, Section 10(b) of the Exchange Act and Rule 10b–5 thereunder. *See Ettinger v. Merrill Lynch, Pierce, Fenner & Smith,* 835 F.2d 1031, 1033 (3d Cir.1987) ("the SEC has established through its enforcement actions the principle that charging undisclosed excessive commissions constitutes fraud"); *Charles Hughes & Co., Inc. v. SEC,* 139 F.2d 434, 436 (2d Cir.1943), *cert. denied,* 321 U.S. 786, 64 S.Ct. 781, 88 L.Ed. 1077 (1944) (undisclosed markup policy "operated as a fraud and deceit upon the purchasers, as well as constituting an omission to state a material fact"). Thus, defendant's argument again turns on the factual question of whether the charges were excessive.

Defendant also argues that the SEC's kickback allegations fail to state a cause of action under Rule 10b–5 because the alleged fraud was not committed "in connection with" the purchase or sale of a security. With regard to the alleged kickback scheme, the Complaint states that Feminella

9. ... secretly paid Granston a portion of the compensation he earned on the securities transactions Granston directed to him. CU and its pension fund were unaware of this kickback scheme until an internal investigation revealed it in February 1991.

10. Feminella never disclosed to, and attempted to hide, the kickbacks that he paid to Granston from CU, its pension fund, and the brokerage firms that employed him. In June 1991, he was terminated by the brokerage firm then employing him.

Compl. ¶¶ 9–10. The SEC asserts that, by reason of the foregoing, Feminella violated Section 17(a) of the Securities Act, Section 10(b) of the Exchange Act and Rule 10b–5 thereunder.

The Supreme Court has stated that a court should be reluctant to imply a 10b–5 cause of action for wrongs that do not fall within Section 10(b)'s fundamental purpose of requiring full and fair disclosure to participants in securities transactions of information that would be useful to them in deciding whether to buy or sell securities. *Santa Fe Indus., Inc. v. Green,* 430 U.S. 462, 477–78, 97 S.Ct. 1292, 1302–03, 51 L.Ed.2d 480 (1977); *see also Manufacturers Hanover Trust Co. v. Smith Barney, Harris Upham & Co., Inc.,* 770 F.Supp. 176, 180 (S.D.N.Y.1991) ("the relevant inquiry is whether defendants' alleged fraud deprived plaintiff of information that might have been useful to it in deciding whether to purchase or sell securities which it actually did purchase or sell").

In *Chemical Bank v. Arthur Andersen & Co.,* 726 F.2d 930 (2d Cir.1984), *cert. denied,* 469 U.S. 884, 105 S.Ct. 253, 83 L.Ed.2d 190 (1984), the Second Circuit held that in order to state a claim under Section 10(b) and Rule 10b–5 thereunder, the alleged misrepresentation, omission or fraudulent device must go to either the value of the securities themselves or the nature of the con-

siteration. In that case, Chemical Bank and other banks loaned money to a borrower in reliance on statements by the borrower's accountant, Arthur Andersen, regarding the borrower's financial strength. The loan was collateralized by a pledge of stock owned by the borrower. The court upheld the dismissal of the banks' claim because the banks did not allege any misrepresentation regarding the value of the stock pledged, with respect to which "the banks got exactly what they expected." *Id.* at 943. The court stated that

> [t]he purpose of § 10(b) and Rule 10b–5 is to protect persons who are deceived in securities transactions—to make sure that buyers of securities get what they think they are getting and that sellers of securities are not tricked into parting with something for a price known to the buyer to be inadequate or for a consideration known to the buyer not to be what it purports to be.

*Id.* Section 17(a) requires the same "stringent connection" between the misrepresentation or omission and the securities transaction as Section 10(b) and Rule 10b–5. *Schwartz v. Duckett,* 88 Civ. 5395, 1989 WL 16054 *2 (S.D.N.Y. February 21, 1989) (citing *Chemical Bank, supra* ).

█ This court recently held in *United States v. Rudi,* 902 F.Supp. 452 (S.D.N.Y. 1995), that an undisclosed scheme through which a financial adviser to a local government authority received kickbacks from the lead underwriter of a bond issue for the government authority constituted fraud "in connection with" the sale of the bonds, under Section 10(b) and Rule 10b–5. The court distinguished *Chemical Bank,* stating that,

> [u]nlike Chemical Bank, Rudi's alleged fraud did involve the consideration paid for the 1990 Bonds. Had an amount allocated for Rudi's payment not been included in the underwriting spread, the spread would have been smaller and the [government authority] would have received more from the bond offering. Rudi's actions thus tricked the [government authority] into parting with something for an inadequate price and a consideration which the buyer knew was not what it purported to be.

902 F.Supp. at 456–57.

Feminella argues that *Rudi* is distinguishable from the instant action because here the SEC does not allege that Feminella could, or did, inflate the prices of the securities sold to CU as a result of the kickbacks. Rather, Feminella's employer apparently was unaware of the scheme, from which defendant draws the inference that CU would have been charged the same prices notwithstanding the alleged kickback scheme.

Nevertheless, the SEC alleges that Feminella knew, and concealed from his client, that the consideration paid included money that he intended to, and did, kickback to his contact, an agent of CU. Therefore, defendant allegedly knew, and did not divulge, that the consideration was not what it purported to be. *See Chemical Bank,* 726 F.2d at 943. Moreover, under the facts alleged, CU was not getting what it thought it was getting in return for the consideration paid. *See id.* Assuming that the allegations contained in the Complaint are true, CU was wholly unaware that part of its payments was being diverted to one of its own agents, through defendant. If such kickbacks were attainable, they should have been received by CU itself, not its agent; in other words, had CU been aware of the kickback scheme, it would have been in a position to negotiate a lower markup on the securities with defendant's employer. Accordingly, the Court finds that the alleged scheme involved the "nature of the consideration" and was, therefore, "in connection with" CU's purchase of securities.

### Rule 9(b)

█ Finally, defendant contends that the Complaint must be dismissed for failure to plead fraud with particularity, pursuant to Rule 9(b). With regard to the kickbacks claim, defendant states that the SEC has not alleged the dates or amounts of any payments, the manner of such payments, or the total value of the payments. Regarding the SEC's claim that Feminella caused CU to be charged excessive markups on 33 transactions, defendant points out that the Complaint does not specify any of the 33 transactions, the prices CU paid or the size of the markups. Rather, the SEC only alleges the

range of the size of the transactions and the range of the size of the markups thereon.

Rule 9(b) provides that "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity. Malice, intent, knowledge, and other condition of mind of a person may be averred generally." Rule 9(b), however, "must be read together with rule 8(a) which requires only a 'short and plain statement' of the claims for relief." *Ouaknine v. MacFarlane,* 897 F.2d 75, 79 (2d Cir.1990). The Second Circuit has stated that "the particularity requirement of Rule 9(b) is designed to further three goals: (1) to provide a defendant with fair notice of the plaintiff's claim, (2) to protect a defendant from harm to his or her reputation or goodwill, and (3) to reduce the number of strike suits." *Cosmas v. Hassett,* 886 F.2d 8, 11 (2d Cir.1989).

A plaintiff alleging fraud in connection with a securities transaction "must specifically allege the acts or omissions upon which his claim rests. It will not do merely to track the language of Rule 10b–5 and rely on such meaningless phrases as 'scheme and conspiracy' or 'plan and scheme and course of conduct to deceive.'" *Ross v. A.H. Robins Co.,* 607 F.2d 545, 557 (2d Cir.1979), *cert. denied,* 446 U.S. 946, 100 S.Ct. 2175, 64 L.Ed.2d 802 (1980). However, "Rule 9(b) does not require nor make legitimate the pleading of detailed evidentiary matter." *Id.,* n. 20. Where the complaint "gives fair and reasonable notice to defendant[ ] of the claim and the grounds upon which it is based, ... [it] satisf[ies] one of the main purposes of Rule 9(b), specifically, providing defendant[ ] with fair notice of the claim to enable preparation of a reasonable defense." *Spear, Leeds & Kellogg v. Public Serv. Co.,* 700 F.Supp. 791, 793 (S.D.N.Y.1988).

The Court finds that the Complaint in this action provides defendant with fair notice of the SEC's claims, enabling him to prepare a reasonable defense. Given the long-term nature of the scheme alleged, requiring plaintiff to list each securities transaction or alleged kickback payment by date, amount and markup would contravene the requirements of Rule 8(a) while not furthering the purposes behind Rule 9(b).

*CONCLUSION*

For the reasons stated above, defendant's motion to dismiss is denied. Counsel are directed to appear for a pre-trial conference at the United States Courthouse, Courtroom 14C, 500 Pearl Street, New York, New York on December 13, 1996 at 11:00 a.m. for the purposes of scheduling further proceedings in this action.

SO ORDERED.